THOMAS B. LOVE v. D. W. WILCOX ET AL.

No. 5651.   Decided May 17, 1930, June 4, 1930.
(28 S. W., 2d Series, 515.)

*Walter C. Woodward, W. R. Cousins, Chas. H. Jenkins, Frank C. Davis, Robert L. Cole, Maco Stewart, Cato Sells, John M. Henderson, W. E. Spell, Alva Bryan, John J. Foster, John Perkins, E. J. Mantooth, W. M. Taylor, Cullen F. Thomas, J. W. Hassell, George O. Wallace, W. J. Rutledge, Jr., H. Bascomb Thomas, Jr.,* and *Reuben W. Gray,* for relator, cited:

Rev. Stats., Arts. 2955, 3093, 3097, 3100, 3101, 3107, 3110, 3111, 3114, 3115, 3116, 3117; Acts First Called Session 40th

Legislature, Chap. 67, p. 193; Art. 230, Penal Code; Penal Code, Arts. 207, 230; Acts of 1st Called Session 28th Legislature of Texas, Sec. 94; Acts Second Called Session, Texas Legislature, 1923, p. 74; Art. XVI, Constitution of Texas; Briscoe v. Boyle, 286 S. W., 375; Beene v. Waples, 108 Texas, 140; Gilmore v. Waples, 188 S. W., 1037; Greenwood on Public Policy, Rule 222; Haggan v. Wardlow, 8 Bro. P. C., 281; Maddox v. Ferguson, 236 S. W., 888; Nixon v. Herndon, 47 Supreme Court Reporter, 446; Roby v. Carter, 25 S. W., 725; Cummings v. Missouri, 4 Wallace, 277; Westerman v. Mims, 227 S. W., 178; Waples v. Marrast, 108 Texas, 5.

*F. A. Williams, H. M. Garwood, Wm. H. Burges, Rice Maxey* and *C. C. Renfro,* for respondents, cited:

Texas Constitution, Art. 1, Secs. 2, 27, 29; Rev. Stats., Arts. 2978, 3107, 3111, 3146, 3147, 3148, 3158, 3159, 3160; 25 Ruling Case Law, P. 984, Secs. 231–2, P. 1000, Sec. 243; Sutherland, Statutory Construction, Secs. 261–2, 215–8; Anderson v. Rogan, 54 S. W., 242; Arnold v. Leonard, 273 S. W., 799; Baer v. Gore, L. R. A., 1917 B, 723; Beach v. McKay, 191 S. W., 557; Beene v. Waples, 187 S. W., 191; Boozer v. Terrell, 75 S. W., 482; Britton v. Board, 51 L. R. A., 115; Cain v. Page, 42 S. W., 336; Caven v. Coleman, 101 S. W., 199; DePoyster v. Baker, 34 S. W., 106; Don v. Pfister, 155 Pac., 60; Fitzpatrick v. Childs, 228 Pac., 485; Francis v. Sturgill, 174 S. W., 753; Furnish v. Robinson, 157 S. W., 744; Grigsby v. Harris, 27 Fed. (2nd) 942; Gulf Production Co. v. Garrett, 24 S. W. (2nd) 389; Haker v. Robinson, 157 S. W., 1138; Hopper v. Stack, 56 Atl., 1; Kelso v. Cook, 110 N. E., 987; Love v. Taylor, 8 S. W. (2nd) 795; Metropolitan L. Ins. Co. v. Love, 108 S. W., 821–1157; Morris v. Mims, 224 S. W., 587; Morrow v. Wipf, 115 N. W., 1121; Nixon v. Condon, 34 Fed. (2nd) 464; Rebstock v. Superior Court, 146 Cal., 308, 80 Pac., 65; Riter v. Douglas, 109 Pac., 444; Robbins v. Thompson, 8 S. W. (2nd) 813; Rouse v. Thompson, 81 N. E., 1109; Scurry v. Nicholson, 9 S. W. (2nd) 747; Sheppard v. Terrell, 79 S. W., 23; State v. Michel, 46 So., 430; State v. Drexel, 105 N. W., 174; State v. Flaherty, 41 L. R. A. (N. S.) 132; Teat v. McGaughey, 22 S. W., 302; Trinity L. & A. Society v. Love, 116 S. W., 1139; Waples v. Marrast, 184 S. W., 180; Ward C. & P. Co. v. Carpenter, 200 S. W., 521; Westerman v. Mims, 111 Texas, 29, 227 S. W., 178; Wooten v. Rogan, 73 S. W., 799.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

Relator seeks by mandamus from this Court, in the exercise of its original jurisdiction, to compel the State and County Democratic Executive Committees to cause his name to be printed on the official ballot in the approaching primary of the Democratic Party as a candidate for the nomination for Governor. Relator also asks that the Court, under its writ of mandamus, compel the State and County Democratic Executive Committees to desist and refrain from enforcing certain resolutions adopted by the State Committee on February 1, 1930.

Disregarding mere conclusions, the facts on which relator seeks relief are undisputed. Relator possesses all qualifications specified in the Constitution and statutes for one to hold the office of Governor. He has for many years been a member of the Democratic Party, and active in his affiliations therewith, holding important offices in democratic state and national administrations. At this time he holds the office of State Senator as a nominee of the Democratic Party. He has voted for all nominees of the Democratic Party for all offices at every election since he became a voter in 1892, except that he voted for the Republican nominee for Governor of Texas in 1924 and for the Republican Presidential Electors in 1928. Relator not only voted for the Republican Presidential Electors in 1928 but actively participated in the 1928 campaign to defeat the Democratic Presidential Electors. Relator participated in all 1928 precinct and county Democratic conventions and primaries, taking the pledge which the State Committee had prescribed for participation therein, which read as follows:

"I am a Democrat, and agree to support the nominees of the Party."

The Democratic State Convention held at Beaumont in May, 1928 to elect delegates to the Democratic National Convention excluded relator from participation therein, together with all others who failed or refused to take a pledge to support all nominees of the party or who stated they would not vote for the 1928 Democratic Presidential Electors. Relator offers "to take the test prescribed by Article 3110, Revised Civil Statutes, and to comply with the pledge contained in that test to the utmost of conscience and good faith."

The State Democratic Executive Committee on February 1, 1930, adopted resolutions which the Committee deems it its duty to enforce, as follows:

### FIRST.

"BE IT RESOLVED, That this committee hereby extends an invitation to all qualified voters, regardless of previous political views or affiliations, to enter and participate as voters in its nominating primaries and conventions who are willing to and do take the statutory party pledge.

### SECOND.

"BE IT RESOLVED, That the Executive Committee prescribes the following qualifications in addition to those now prescribed by law, for candidates for State offices in the Democratic primaries of 1930, and that no applicant or candidate for the Democratic nomination for State office who does not possess the following qualifications shall appear on the official ballot or be certified as a candidate in the Democratic primaries, to-wit:

1. That in the last preceding general election he must not have voted against any nominee or presidential elector of the Democratic Party, if he participated either in the primary elections or conventions of the Democratic Party in 1928, and took a pledge to support the nominees of the Democratic Party.

2. That he must in good faith without any reservations pledge himself in writing filed with the Chairman of the Executive Committee not later than the date set for filing applications, to support all nominees of the Democratic Party during the year 1930.

3. And that he does not now advocate a voter's entering a party primary or convention and taking the prescribed pledge with reservations mental or otherwise.

### THIRD.

"That it is the sense of this Committee that while we can not legally act on the certification of applicants who desire to have their names placed on the Democratic primary ballot for state offices in 1930,—that it is the sense of this Committee that any present or proposed applicant for certification who voted in the Democratic primary in 1928, or participated in any of the primaries or conventions of the Democratic Party in 1928, and in said primaries or conventions took the prescribed pledge to support the nominees of the party and then broke his pledge and bolted the ticket, and voted for the nominees of any other party, that by so doing he forfeited his right to the support of the Democratic Party, and forfeited his right to have his name placed on the Democratic primary ballot in 1930; and it is the further sense of this Committee that any present or proposed applicant who desires to have his

name certified and placed on the Democratic primary ballot in 1930, shall be refused such certification who claims the right and intention, though he has participated in a Democratic primary for the nomination of candidates, thereafter, to repudiate the pledge taken and to vote against the party nominee if his judgment or conscience dictates.

FOURTH.

"Art. 3111 of the R. C. S. of Texas directs that the State Executive Committee shall meet on the Second Monday in June, preceding each general primary, and that, at this meeting, shall take action certifying to County Chairmen the names of the various candidates. In view of this law, it is the opinion of the State Democratic Executive Committee that such action could not lawfully be taken at this time, and it is, therefore,

RESOLVED That the Committee decline to certify names to the County Chairmen or take any action relative thereto prior to said second Monday of June, 1930."

The question here presented is simply whether the law, when applied to these facts, entitles relator to a writ of mandamus from the Supreme Court under which he would obtain all or any part of the relief he seeks?

In view of the holdings of the Supreme Court of Colorado that a judge who was a candidate in a primary was disqualified by his interest to adjudicate matters pertaining to the primary, (Cowie v. Means, 39 Colo., 1, 88 Pac., 485; MacMillan v. Spencer, 28 Colo., 80, 62 Pac., 849; Phillips v. Curley, 28 Colo., 34, 62 Pac., 837), Chief Justice Cureton, being a candidate this year for the Democratic Primary nomination for the office of Chief Justice of the Supreme Court, declined to participate in the decision of this case until the Court could determine the question as to his disqualification. As have many eminent justices of this Court, (Investment Co. v. Grymes, 94 Texas, 618; City of Oak Cliff v. The State, 97 Texas, 394), Chief Justice Cureton declined to take any part in deciding whether he was disqualified. After careful investigation, the Court, acting through the other justices, before the submission of the case, reached the conclusion that there was no doubt that the Chief Justice was qualified to sit under the Constitution of Texas. Some of the grounds for that conclusion will be briefly stated.

The Colorado decisions furnish no reliable guide for the adjudication to be made by this Court. The question before the Supreme

Court of Colorado in each of the cited cases was whether a judge was disqualified under a statute directing a change of venue "when *from any cause* the judge is disqualified to try the action." Art. 31, Compiled Laws of Colorado. These cases, therefore, called for judicial construction of what was meant by disqualification *from any cause,* while our Constitution not only specifies the grounds for disqualification but such grounds have always been held by the Supreme Court to be exclusive. Investment Co. v. Grymes, 94 Texas, 618; Taylor v. Williams, 26 Texas, 586, 587.

Under the Texas Constitution, it is the duty of the judge to sit save "in any case wherein he may be interested, or where either of the parties may be connected with him by affinity, or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case." Sec. 11, Art. 5, Constitution.

Every constitution of Texas since that of 1845 has forbidden a judge to sit in any case wherein he is interested. City of Dallas v. Peacock, 89 Texas, 61. So often has this phrase "case wherein he is interested," been interpreted that its meaning no longer admits of reasonable doubt.

Under the broad language of the Colorado statute, the highest court in that State might have regarded interest in the question to be decided as a good ground for granting a change of venue. In Texas, our constitutional prohibition has been uniformly construed as requiring the judge to sit who is interested in the question to be decided but who has no direct and immediate interest in the judgment to be pronounced.

The Court, construing the Constitution of 1869, in an opinion of Chief Justice Roberts, said: "The fact that the presiding judge was the person from whom the property was alleged to be stolen in an indictment for theft, is not a good ground of disqualification, because he is not thereby shown to be 'interested' in the 'case,' not being a party thereto or liable to any loss or profit therefrom, otherwise than as any other person in the body politic." Davis v. The State, 44 Texas, 524.

Soon after the adoption of the present constitution, the judge of the District Court of Jefferson County announced that he was embarrassed to proceed with a trial because "of his personal interest adverse to the appellants in the *questions involved* in this cause." The objection to the judge's qualification to determine the cause was overruled by the Supreme Court in an opinion by Judge Bonner, stating:

"The Constitution prohibits a judge from sitting in a case in which he may be interested. Const. 1876, art. V, sec. 11.

"The Statute is to the same effect. R. S., art. 1090.

"The interest of the learned judge presiding, however, was simply in the question involved, and not in the result of the suit. This was not such a disqualifying interest as would prevent him from trying the cause, or would authorize the appointment of a special judge.

"The presiding judge not having been disqualified, it was his duty, however embarrassing, to have proceeded with the trial. Taylor v. Williams, 26 Texas, 583; Railway Co. v. Ryan, 44 Texas, 426; Davis v. The State, 44 Texas, 523; 1 Greenl. Ev., sec. 389." McFaddin v. Preston, 54 Texas, 406.

When our present judicial amendment was adopted in 1891, without change of verbiage with respect to disqualification of judges, the Court could not rightly give the language a meaning different from that ascribed to the same language in the previous constitutional provisions. Therefore, the rule announced in McFadden v. Preston, supra, was re-affirmed in decisions as recent as Hubbard v. Hamilton County, 113 Texas, 552, and Robbins v. Limestone County, 113 Texas, 542.

It is obvious that the Chief Justice, who is not a party to this suit and who has neither violated any pledge taken in 1928 nor voted during that year against any democratic nominee or presidential elector, can have no interest other than an interest in the *questions* to be determined, no matter how they may be decided. Much the same sort of interest affects the associate justices. Hence, under the settled interpretation of the Constitution, it is his duty to participate in this decision.

There are numerous decisions in other jurisdictions like that of the Supreme Court of Alabama, wherein it is said:

"The interest which will disqualify must be a pecuniary one, or one affecting the individual rights of the judge. * * * Moreover, 'the liability of pecuniary gain or relief to the judge must occur upon the event of the suit, not result remotely, in the future, from the general operation of the law upon the status fixed by the decision.' 12 Am. & Eng. Ency. of Law, p. 45 et seq." Ex Parte Alabama State Bar Association, 12 L. R. A., 136; Foreman v. Marianna, 43 Ark., 324; Long v. Watts, 110 S. E., 765, 22 L. R. A., 279.

The only conceivable interest of the Chief Justice in the questions here to be adjudicated is indirect, uncertain, conjectural, con-

tingent, and remote. No man can say other than speculatively whether the Court's judicial act, whatever it may be, will redound to his advantage or detriment. On such a state of facts, the law is too well settled in this Court to be open to dispute.

In Judge Brown's carefully considered opinion in the case of the City of Oak Cliff v. The State, 97 Texas, 391, it is said:

"In his treatise on Courts, Mr. Work expresses the result of the authorities upon the question thus: 'The interest which will disqualify a judge must be direct and immediate and not contingent and remote.' P. 396."

After reviewing the Texas cases relied upon as sustaining a contrary conclusion, Judge Brown's opinion continues with the statement:

"It is apparent from these authorities that in each case the interest of the presiding judge was directly and immediately affected by the judgment that he entered; it acted immediately upon the subject without the interposition of other authority, and each came strictly within the rule laid down by Mr. Work."

Finally, Judge Brown's opinion definitely and positively approves the declaration in a cited New York case that the true rule is "that where a judicial officer has not so direct an interest in the cause or matter as that the result must *necessarily* affect him to his personal or pecuniary loss or gain then he must sit."

In accordance with the Court's decision that the Constitution, rightly construed, does not disqualify him, the Chief Justice has participated in the decision of all other questions in this case save that relating to his disqualification.

If the Supreme Court has original jurisdiction to adjudicate this case, it is derived from Senate Bill No. 16, approved February 14, 1930. By this bill the Legislature undertakes to confer original jurisdiction on the Supreme Court or any court of Civil Appeals to issue the writ of mandamus or any other mandatory or compulsory writ or process, against any chairman or member of any executive committee or primary committee or primary election officer of any political party, to compel the performance in accordance with the laws of this State of any duty imposed upon them respectively by law.

The respondents move to dismiss relator's suit on the ground that the bill is void because it attempts to confer on the Supreme Court and on the Courts of Civil Appeals power wholly political; and because it attempts to give concurrent jurisdiction to the Supreme Court and to the Courts of Civil Appeals in such a way that

neither alone has jurisdiction; and because it attempts to confer on other courts a jurisdiction which the Constitution vests exclusively in the District Court.

By section 8, article V, the Constitution gives to the District Court power to issue writs of mandamus. This is a broad, general grant of original jurisdiction, not dependent on the necessity to enforce a jurisdiction otherwise acquired. By section 6, of article V, the Courts of Civil Appeals are given "such other jurisdiction, original and appellate, as may be prescribed by law," in addition to specified appellate jurisdiction. In section 3, of article V, of the Constitution, after declaring that the jurisdiction of the Supreme Court shall be appellate *only* except as specified, it is provided: "The legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except against the Governor of the State."

This Court has heretofore laid down certain limitations on the power of the Legislature to specify classes of cases which may be brought within the Court's original jurisdiction. One is that the right to the duty required to be performed by mandamus shall not be "dependent upon the determination of any doubtful question of fact." Teat v. McGaughey, 85 Texas, 486, 487. Another limitation is that the writ of quo warranto or mandamus be a proper or necessary process for enforcement of the right asserted. Pickle v. McCall, 86 Texas, 218. A third is there must be some strong and special reason for the exercise of this extraordinary original jurisdiction by a court designed primarily as the court for the correction by appellate review of errors of inferior courts in determining questions of law. In this connection, the Court found no objection to the Legislature requiring it to exercise original jurisdiction by mandamus, where the proceeding "involves questions which are of general public interest and call for a speedy determination." Betts v. Johnson, 96 Texas, 363.

The statute under consideration, in so far as it relates to mandamus proceedings, comes within every one of these limitations. Before one can be entitled to a mandamus from this Court under the statute he must establish his case on uncontroverted facts, as under the other statutes already upheld. When the uncontradicted facts show that a relator has the right to exact performance by public functionaries of duties imposed on them by law, his appropriate remedy is the writ of mandamus. No questions could arise of wider public interest or of graver importance to the State than those involving abridgment of rights of citizens to participate in govern-

ment through the selection of those who may become public officials by means of party nominations. A speedy, *final* determination of such questions is at times possible only through the exercise of jurisdiction elsewhere than in the District Court.

Is the statute void because it seeks to confer political instead of judicial power on the appellate courts?

Since Marbury v. Madison, 1 Cranch 166, 167, 1 U. S., 381, the courts of last resort of the several states have almost universally followed the opinion of Chief Justice Marshall to the effect that it is clear that "where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, * * * the individual who considers himself injured has a right to resort to the laws of his country for a remedy. * * * The question whether a right has vested or not is, in its nature, judicial, and must be tried by the judicial authority."

The precise question now before us was presented in Gilmore v. Waples, 108 Texas, 167–176. The question was whether the power to be exercised by the courts would be political or judicial in restraining action of the State Democratic Executive Committee violative of the primary statutes and prejudicial to the legal rights of a candidate for a primary nomination. Affirming that the courts, in ordering such restraint, would exercise judicial power, the profound opinion of Chief Justice Phillips says:

"The contention of the committee upon this phase of the case is that there is presented but a political question and at most but a political right. * * * For what purpose and to what end, it may appropriately be inquired, have the various statutes in relation to party nominations been enacted in this State if the rights and duties therein defined and the matters they purport to govern still present mere political questions, to be settled alone by party law and in the party forum, and are, therefore, beyond the cognizance of the courts? The very purpose of this legislation was to relieve these matters of their mere political character, as was their nature aforetime, and subject them to the regulation of the statute law. The courts exist only to enforce the law. This includes the statute law. * * *

"We do not believe there is any appreciable conflict in the authorities upon the proposition that where the making of party nominations by political parties is once regulated by the statute law the rights created and protected by a statute are legal, as distinguished from political, rights."

In Cook v. Houser, 122 Wis., 556, the Court declares that "the time has long since passed for serious controversy as to whether in this class of cases judicial questions are involved."

Does the provision invalidate the bill which undertakes to make concurrent the jurisdiction of the Supreme Court and of the Courts of Civil Appeals?

Precisely similar concurrent jurisdiction has for years been conferred on these courts to compel a judge of the district court to proceed to trial and judgment. Yet, this Court held in Gulf, C. & S. F. Ry. Co. v. Muse, 109 Texas, 353, as shown by the headnote, that "The power given Courts of Civil Appeals, by Article 1595 Rev. Stats., to require by mandamus, a district judge to proceed to the trial of a cause, does not preclude the Supreme Court from action in the same matter through the power conferred  *  *  * under article 5, section 3, of the Constitution by article 1526 Rev. Statutes." Gulf, C. & S. F. Ry. Co. v. Muse, 109 Texas, 353. The very fact that the jurisdiction of the Court of Civil Appeals had been invoked and exhausted without securing the performance of a duty imposed by statute made a case peculiarly appropriate for the exercise of the authority of the Supreme Court by mandamus in Muse's case. State v. Woodbury, 74 Kans., 878, 879.

In Houtchens v. Mercer, District Judge, decided May 7, 1930, this Court recognizes that possession by an inferior court of concurrent original jurisdiction with a court of last resort does not defeat the jurisdiction of the latter court.

A sound interpretation of constitutional provisions conferring or authorizing the Legislature to confer original jurisdiction on the court of last resort of a state where other constitutional provisions confer concurrent jurisdiction on inferior courts is that declared by the Supreme Court of Illinois after an elaborate review of the authorities, as follows:

"First. That the jurisdiction of the court of last resort in such states is principally appellate; that its original jurisdiction is not a general one, like that conferred on the circuit or district courts, but is a limited one, and concurrent, as far as it extends, with those courts. Second. That, in conferring original jurisdiction by constitutional provision in such cases as mandamus, it was not contemplated that the supreme court would take jurisdiction of all mandamus cases which parties might think best to bring before it, but that such original jurisdiction was conferred that the court of highest authority in the state should have the power to protect the rights, interests, and franchises of the state, and the rights and in-

terests of the whole people, to enforce the performance of high official duties affecting the public at large, and, in emergency (of which the court is to determine), to assume jurisdiction of cases affecting local public interests, or private rights, where there is no other adequate remedy, and the exercise of such jurisdiction is necessary to prevent a failure of justice. Third. That the Supreme Court is vested with a sound legal discretion to determine for itself, as the question may arise, whether or not the case presented is of such a character as to call for the exercise of its original jurisdiction." People ex rel. Kocourek v. Chicago, 193 Ill., 507, 58 L. R. A., 840, 841, 854, 855.

We therefore hold that according to the true intent of our Constitution and statutes, the remedy of mandamus must be pursued in the lower courts unless it is made plain that urgent necessity calls for the exercise of the original jurisdiction of the Supreme Court. Houtchens v. Mercer, District Judge, supra; 18 R. C. L., 101, 22 R. C. L., 685, 38 C. J., 827.

Ordinarily rights may be enforced in a mandamus proceeding by suit in the District Court, appealed to the Court of Civil Appeals, and brought to the Supreme Court by writ of error. Where these ordinary remedies are complete and adequate, the extraordinary original jurisdiction of the Supreme Court or of the Court of Civil Appeals can not be successfully invoked. Buvens v. Robison, Land Commissioner, 117 Texas, 541; International & G. N. R. R. Co. v. Pleasants, 116 Texas, 568; Queen v. Lambourn Valley R. Co., L. R., 22 Q. B. Div., 463; Ex Parte Riddle, 255 U. S., 450.

Blackstone called mandamus a high prerogative writ, which "issues in all cases where the party hath a right to have anything done and hath no other way of compelling its performance." (L. R., 22, p. 466.) Mr. Spelling points out that the feature which distinguishes mandamus from all other remedies is that "it recognizes legal duty and compels its performance. where there is either no remedy at law or no adequate remedy." 2 Spelling Extraordinary Relief, p. 1114.

Considering the province of the writ since long before the adoption of our constitutional provisions, we find no warrant for saying that the Legislature exceeded its authority in making it possible for this Court to take original jurisdiction to issue the writ of mandamus when there is urgent necessity for the exercise of the Court's authority to maintain and protect the general rights and the important interests of the State and of the people. The Attorney General v. Railroad Companies, 35 Wis., 519, 521; The Attorney General v.

City of Eau Claire, 37 Wis., 442, 446; The Homesteaders v. Mc-Comb, 38 L. R. A., (N. S.) 1006, 1007.

This case comes clearly within the class of cases involving the enforcement of the sovereignty of the State and the protection of the citizen's right to effective participation in his state's government. All political power is inherent in the people of Texas, whose government is founded on their authority and maintained for their benefit. Section 2, Art. 1 of the Constitution. Sec. 27 of Art. 1 of the Constitution guarantees that "the citizens shall have the right in a peaceable manner to assemble together for their common good, and apply to those invested with the powers of government, for the redress of grievances or other purposes, by petition, address or remonstrance." Sec. 2 of Art. 1 further pledges the faith of the people of Texas to the preservation of a republican form of government, and declares that "subject to this limitation only, they (the people) have at all times the inalienable right to alter, reform, or abolish their government in such manner as they may think expedient." The primary laws of this State are based upon a recognition of political parties as agencies of the people for the exercise of the powers thus reserved to them by the Constitution. It necessarily follows as a part of the right of the people to organize political parties for the constitutional purposes stated that the people of the State have the power through their Legislature to enact laws having for their purpose the protection of the constitutional rights, declared in the provisions just quoted. As said in Waples v. Marrast, 108 Texas, 5: "In the interest of fair methods and a fair expression by their members of their preference in the selection of their nominees the State may regulate such elections by proper laws."

As declared in State ex rel. Rinder v. Goff, 129 Wis., 668, 109 N. W., 628, 9 L. R. A., (N. S.) 918, 919, 920, "Serious questions as to the construction of the primary law and the duties of executive officers thereunder may properly be considered as questions affecting the prerogatives of the State and the liberties of the whole people, and, on that account, this court may properly consider them in the exercise of its original jurisdiction, because the decision of such questions necessarily prescribes a rule of conduct for all election officers in the State, though the case in which they arise may affect only the nomination for a local office."

The Act under which this proceeding was brought in part reads:

"The Supreme Court * * * shall have the power, or authority, or jurisdiction, to issue the Writ of Mandamus, *or any other Mandatory or compulsory Writ or Process,* against any Chairman

or member of any Executive Committee, or primary committee, or primary election officer, of any political party, to compel the performance, in accordance with the laws of this State, of any duty imposed upon them respectively, by law."

The Constitution, in defining the original jurisdiction which may be conferred upon the Supreme Court, in Sec. 3, Art. 5, states:

"The Legislature may confer original jurisdiction on the Supreme Court to issue *writs of quo warranto and mandamus* in such cases as may be specified, except as against the Governor of the State."

A comparison of the above quotation from the Act with the quoted constitutional provision makes it obvious that the Legislature has attempted to confer power upon the Supreme Court to issue writs under its original jurisdiction other than mandamus and quo warranto, when the Constitution limits the original jurisdiction of the Court to the issuance of writs of quo warranto and mandamus. Applying the rule that the Legislature cannot confer a jurisdiction not permitted by the Constitution (Ex Parte Towles, 48 Texas, 413; Marbury v. Madison, 1 Cranch (U. S.) 137) results in the conclusion that so much of the legislative Act under examination as attempts to confer upon the Supreme Court the power to issue "any other mandatory or compulsory writ or process" save the writ of mandamus, is violative of the Constitution, and is therefore void. However, the Act is not wholly void because the Legislature is without power to confer *original* jurisdiction on the Supreme Court for the issuance of writs or process other than quo warranto and mandamus. The portion of the Act which remains, relating to the issuance of the writ of mandamus, must be upheld as plainly severable and capable of execution in accordance with the legislative intent. Zwernemann v. Von Rosenburg, 13 S. W., 485, 76 Texas, 522; T. & P. Ry. Co. v. Mahaffey, 98 Texas, 395.

Should this Court now refuse to take jurisdiction, relator would be unable to procure any decision from the State's highest judicial authority. No judgment of the District Court could become final in time to be of any avail in view of statutory rights of review by appellate courts.

Relator therefore is without other adequate remedy. Foote v. Bartholomew, 103 Conn., 617; Howells v. Metcalf, 18 S. D., 393, 67 L. R. A., 331; Cook v. Houser, 122 Wis., 554; Rinder v. Goff, 129 Wis., 668, 9 L. R. A., 920. Since his case comes within a class which the Legislature has validly put within the jurisdiction of the Supreme Court, the motion to dismiss is overruled.

Coming to a decision of the case on its merits, the questions for our determination are:

First: Has the State Democratic Executive Committee the power to deny any person the right to participate in the party primaries as a candidate who offers to take the test prescribed by Art. 3110 Revised Statutes, and to comply with the pledge contained in that test to the utmost limits of conscience and good faith, because he advocates or claims the right to violate such pledge in the 1930 general election in so far as such violation may be required by the dictates of his conscience?

Second: Has the State Democratic Executive Committee the power to deny any person the right to participate in the democratic primaries because he voted in 1928 against democratic nominees or electors, after participating in the 1928 conventions or primaries under pledge to support the nominees?

We are not called upon to determine whether a political party has power, beyond statutory control, to prescribe what persons shall participate as voters or candidates in its conventions or primaries. We have no such state of facts before us. The respondents claim that the State Committee has this power by virtue of its general authority to manage the affairs of the party. The statute, Art. 3107, recognizes this general authority of the State Committee, but places a limitation on the discretionary power which may be conferred on that Committee by the party by declaring that, though the party through its State Executive Committee, shall have the power to prescribe the qualifications of its own members, and to determine who shall be qualified to vote and otherwise participate, yet the Committee shall not exclude anyone from participation in the party primaries because of former political views or affiliations, or because of membership or nonmembership in organizations other than the political party. The Committee's discretionary power is further restricted by the statute directing that a single, uniform pledge be required of the primary participants. The effect of the statutes is to decline to give recognition to the lodgment of power in a State Executive Committee, to be exercised at its discretion. The statutes have recognized the right of the party to create an Executive Committee as an agency of the party, and have recognized the right of the party to confer upon that committee certain discretionary powers, but have declined to recognize the right to confer upon the committee the discretionary power to exclude from participation in the party's affairs anyone because of former political views or affiliations, or because of refusal to take any other than the statutory

pledge. It is obvious, we think, that the party itself never intended to confer upon its Executive Committee any such discretionary power. The party when it selected its State Committee did so with full knowledge of the statutory limitations on that committee's authority, and must be held to have selected the committee with the intent that it would act within the powers conferred, and within the limitations declared by the statute. Hence, the Committee, whether viewed as an agency of the State or as a mere agency of the party, is not authorized to take any action which is forbidden by an express and valid statute.

The initial 1903 regulation by statute of party primaries in Texas authorized the county executive committee of the party holding a primary to prescribe additional qualifications for primary participation. Acts 28th Legislature, Chapter CI, Sec. 94, p. 150; 12 Gammel's Laws of Texas.

The State Democratic Platform in 1906 and the message of Governor Campbell, who was elected thereon, demanded an amendment to perfect the primary election laws and to provide for a *uniform* primary test. The Governor advised that a uniform test was "essential to party harmony." House Journal 30th Legislature, Regular Session, 1907, pp. 78, 139.

The House of Representatives adopted an amendment to the bill introduced in obedience to the platform demand, such amendment reading as follows: "Section 114a. No official ballot for primary election shall have on it any symbol or device or any printed matter except a primary test, to be uniform throughout the state, as prescribed by the State Executive Committee at its meeting on the second Monday in June preceding the general primary, and the position and names of candidates and their residences; provided further, that any ballot not having printed at the top such test so prescribed by the State Executive Committee shall be void." House Journal 30th Legislature, Regular Session, 1907, pp. 1475, 1493, 1494, 1533.

The Senate Committee on Privileges and Elections after considering the House bill, as amended, recommended that it do *not* pass. The Senate Committee further recommended the adoption of a substitute for the above quoted section 114a, providing that no one shall vote in any primary election "unless he agree to the following test of party fealty, which shall be printed on the ballot, and which he shall be conclusively presumed to have agreed to by voting such ticket, viz.: 'In voting this ticket I affirm that I have not, and will not vote or participate in the primaries of any other political party

or organization to nominate candidates of such party or organization for any office to be voted upon by the voters at the ensuing general election, and I further affirm that I will not vote for or in any way aid or encourage the election at the ensuing general election, of any person nominated by any other political party or organization for any office who has been by any other such political party or organization nominated in opposition to the candidate for such office nominated in this primary in which I participate.' "

The Senate substitute further provided: "Any person who, at any primary election, votes a ballot with a pledge of party fealty printed thereon, as provided in Section 103 of this act, and at the time of voting said ballot said voter had prior thereto on the same day voted for or participated in, the nomination of candidates for office by any opposing political party or organization, or if said voter should after voting said ballot, violate the pledge taken by him, he shall in either event be guilty of a misdemeanor within the meaning of this act, and shall be punished accordingly."

The Senate rejected the substitute of the Senate Committee on Privileges and Elections, and adopted the House bill, after first amending it, at the instance of Senator Senter, so as to make section 114a read as follows:

"No official ballot for primary election shall have on it any symbol or device or any printed matter except a primary test, to be uniform throughout the State, which shall read as follows: 'I am a ———— (inserting name of the political party or organization of which the voter is a member) and pledge myself to support the nominees of this primary,' and any ballot which shall not contain such test printed above the names of the candidates thereon shall be void and shall not be counted. Such ballot shall also contain the names and residences of the candidates." Senate Journal Regular Session, 30th Legislature, 1907, pp. 917, 920, 921, 1081, 1100, 1125, 1177, 1178; Acts Regular Session 30th Legislature, chapter 117, sec. 114a; 13 Gammel's Laws of Texas, p. 329.

The Second Called Session of the 38th Legislature in 1923 amended the statute, which since 1903 had conferred power on the county executive committee to prescribe additional qualifications for primary voters, so as to direct that "*all* qualified voters under the laws and Constitution of the State of Texas who are bona fide members of the Democratic Party shall be eligible to participate in any Democratic party primary election, provided such voter complies with all laws and rules governing party primary elections; however, ·

in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas." Acts 38th Legislature, Second Called Session, chapter 32, p. 74; 21 Gammel's Laws of Texas.

The amendment of 1923 was declared unconstitutional by the Supreme Court of the United States. Nixon v. Herndon, 273 U. S., 536, 47 Sup. C. Reporter, page 446. The 40th Legislature, at its first called session, in 1927, repealed the 1923 amendment, and enacted what is now article 3107 in Texas Complete Statutes of 1928, in language as follows: "Every political party in this State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party; provided that no person shall ever be denied the right to participate in a primary in this State because of former political views or affiliations or because of membership or non-membership in organizations other than the political party." Acts 40th Legislature, First Called Session, chapter 67, p. 193; 25 Gammel's Laws of Texas.

At a regular session of the 41st Legislature a bill passed the House and Senate to amend article 3107 so as to make it read: "Every political party in this State, through its State Executive Committee, shall have the power to prescribe the qualifications of its own members, and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party and the qualifications of those entitled to have their names placed on the official ballot at any primary election of such party." The Governor vetoed the bill as disruptive of party harmony. Senate Journal, Regular Session 41st Legislature, 1929, pages 647, 1249, 1250, 1251.

It is shown by the above recited history of the legislation governing both the pledge and the power of party committees:

First: That the Legislature in formulating the present mandatory uniform test expressly rejected by votes of both houses the proposition to confer on the State Executive Committee the power to prescribe the tests for participation in party primaries after the House had passed an Act conferring such power.

Second: That the Legislature expressly refused, in rejecting the Senate Committee's amendments, to either make the test pledge *legally* binding by imposing a penalty for its violation, or to require the voter to agree *not* to vote for or support candidates of other

parties in the general election *after* he had participated in the primary.

Third: That after the Legislature had expressly prohibited the denial to any person of the right to participate, by vote *or otherwise,* in a primary because of former political affiliations, legislation to strike out the prohibition failed of enactment because of the Executive veto.

No court could justify putting into a statute by implication what both houses of the Legislature had expressly rejected by decisive votes. The House and Senate Journals leave no room for doubt of the legislative intent to deny the power exercised by the State Committee in seeking to debar names from the primary ballots under the resolutions of February 1, 1930. Once the legislative intent is ascertained the duty of the court is plain. To refuse to enforce statutes in accordance with the true intent of the Legislature is an inexcusable breach of judicial duty, because an unwarranted interference with the exercise of lawful, legislative authority.

The Supreme Court uniformly ascribed to the test statute that meaning which is in complete harmony with the journal record of its adoption. In Koy v. Schneider, 110 Texas, 383, it was declared that the qualified elector who participated in a primary and took the statutory pledge was *legally* free to vote as he chose in the general election, though in so doing he might violate good conscience or his moral obligation. In Westerman v. Mims, 111 Texas, 37, 38, the Court declined to construe the statute as *invariably* requiring the casting of ballots by primary voters for *all* nominees of the primary. The Court declared that "the purpose of the Legislature was the same as the pre-existing purpose of the party managers, and that was to exclude from party action all persons save those holding a *present* party allegiance and having a bona fide *present* intention to support the party nominees." It was therefore determined that the obligation assumed in taking the statutory pledge was a purely *moral* obligation binding no longer than it could be conscientiously performed.

Under familiar and often declared principles, the Legislature is presumed to have intended, when the test-pledge statute was put in the Revised Statutes of 1925, that the unchanged words should have the effect and meaning given to them by the previous decisions of the Supreme Court. Pearson v. West, 97 Texas, 238; Cargill & Dennis v. Kountze Bros., 86 Texas, 400.

The San Antonio Court of Civil Appeals in holding that executive committees had no authority to exact of prospective voters any

other promise or pledge than that prescribed by the statute, defined the test as "an express declaration of the voter that he is a member of the party holding the election, and that he will support the nominees of that election." The Court said with regard to one's right to vote in a party primary, under the statutory regulations: "If he considers himself a member of the party holding the election, and if he has a present intention to vote for the nominees selected at such election, he is entitled to vote therein, and by doing so he obligates himself to support such nominees at the ensuing general election. The law does not purport to measure his eligibility by his past political performances, but by his present intentions; not by what he has done or omitted to do in the past, but by what he promises, and in honor obligates himself, to do in the immediate future," citing Westerman v. Mims, 111 Texas, 29, 227 S. W., 178; Briscoe v. Boyle, 286 S. W., 375.

In an opinion of Chief Justice Pleasants, delivered November 22, 1928, in the case of Clancy v. Clough, the Galveston Court of Civil Appeals determined that the Democratic Executive Committee of the City of Houston was governed by the statutes of the State in placing names on primary ballots and in prescribing a pledge for candidates, and that a resolution of the Committee requiring a candidate to take a pledge that he had supported the democratic nominees in the last election and would support all democratic nominees in the general election was unlawful, and beyond any authority possessed by the Committee under the statutes.

The statute of 1927 amending Art. 3107, instead of conferring power on the State Committee, as is argued, to deny the right of a candidate to appear on the official ballot in 1930, because of his vote against party nominees or electors in 1928, plainly and positively forbade the exercise of any such power. Prohibition against such action by the State Committee could not well be more clearly expressed than by the language that the Committee's power to prescribe qualifications of members and to determine who might vote or otherwise participate in the party primaries was subject to the express qualification "that no person shall *ever* be denied the right to participate in a primary in this State because of former political views or affiliations."

This statute was never meant to authorize the committee by its action to override or change the *uniform* test prescribed by the State itself in the test-pledge statute. The Committee is utterly wanting in authority to subtract from or add to the words of the statutory pledge, which is to be taken in the light of the definition of its terms

by this Court. The relator fully complies with the law's requirements in so far as promises about his future political action is concerned when he offers to take "the test prescribed by Article 3110, Revised Civil Statutes, and to comply with the pledge contained therein to the utmost of conscience and good faith."

The power to pass on the sincerity of the candidate's pledge and to endorse or condemn his past party record is to be exercised by the party voters. The statutes jealously guard the voters' power in denying power to the party committees. It was correctly ruled by the Attorney General, through Mr. Dumas, in 1916: "If proper application is made the committee should place the name of the candidate on the ballot and the members of the party—the voters themselves—would be the best judges of his fidelity to the party and make that decision at the polls." The ruling is repeated through Assistant Attorney General Keeling when he said: "The law, for reasons which seem to the writer to be obvious, declines to repose in any committee the ultimate right to pass upon a candidate's democracy. The right is inherent in the sovereign voters of such political party to determine that question." Atty-General's Reports, 1914-1916, at pages 200 and 204.

Moreover, the language of Article 3107 is fairly susceptible of no other interpretation than that the Legislature intended the same qualifications to be prescribed by the State Committee for *all* participating in a party primary, whether as voters or candidates, and further that the same qualifications must be prescribed for all candidates. By the resolutions of February 1, 1930, all qualified voters, regardless of previous political views or affiliations, are expressly invited to participate in the 1930 primaries, as are all candidates save those for State offices. Because of the attempted discrimination between candidates and between certain candidates and voters, in violation of the statute, the resolutions can not be upheld.

The State Democratic Executive Committee has not yet certified any names of candidates to the County Committee, but has deferred such certification until the second Monday in June, 1930, which is the date fixed by article 3111 of the Revised Statutes of Texas for such action to be taken.

So far as the State Committee's duty of certification of names is concerned, the date for its performance has not arrived. The Committee has adopted certain void resolutions, which relator is entitled to have the court compel respondents to ignore, by mandamus, in order to enforce his clear legal right to the performance of the duties relative to his candidacy which the statutes mandatorily im-

pose on the Committees. Ex Parte Dubuque & Pacific R. R., 1 Wall. 73, 68 U. S., 73; Brewster v. Sherman, 195 Mass., 222, 11 Ann. Cas., 418; Attorney General v. R. R. Companies, 35 Wis., 520; Elliott v. City of Detroit, 121 Mich., 612, 615; State v. Board of Presidents and Directors, St. Louis Public Schools, 35 S. W., 622. Despite the adoption of these resolutions and the respondents' answer herein, this Court will not assume that the State Committee or any County Committee intends to fail to do its duty under the law as declared by the Supreme Court.

Mr. Spelling states a rule governing mandamus which appears sound, as follows:

"A relator is not entitled to the writ unless he can show a legal duty then due at the hands of the respondent; and until the time arrives when the duty should be performed, no threats or predetermination not to perform it can take the place of such default. The law does not contemplate such a degree of diligence as the performance of a duty not yet due. The general rule is that the writ will not be granted in anticipation of a supposed omission of duty, however strong the presumption may be that the person sought to be coerced by the writ will refuse performance at the proper time. An important reason for refusing the writ in such cases is, that until the duty is due, no practical question can be presented to the court, but simply a supposed case." 2 Spelling Extraordinary Relief, pp. 1135, 1136.

At this time, the law entitles relator to the relief he seeks to the extent of awarding to him a mandamus, commanding and requiring respondents to proceed with their statutory duties as though the resolutions of February 1, 1930, had not been adopted and specifically commanding respondents and each of them to desist and refrain from enforcing said resolutions in certifying names of candidates for the 1930 Democratic primaries and requiring respondents to be governed by this opinion in the performance of the duties to which it relates. Judgment will be entered accordingly, without prejudice to relator's right to invoke the Court's jurisdiction in this cause for further relief, should that become necessary for the enforcement of his complete statutory rights.

Opinion delivered May 17, 1930.

#### ON MOTION FOR REHEARING.

Mr. Justice GREENWOOD delivered the opinion of the court.

The respondents complain that error was committed in the statement of the case herein as follows:

First: In the statement that relator was excluded from participation in the Democratic State Convention held at Beaumont on May 28th to select delegates to the Democratic National Convention, when he was not actually excluded from that convention, but was excluded from the State Convention held at Dallas in September, 1928.

Second: In the order in which the court numbered the resolutions adopted by the State Democratic Executive Committee on February 1, 1930, in that the resolution called "fourth" in the opinion was adopted "first."

It is true that the Beaumont Convention held at Beaumont in May did not exclude relator, and that relator did there take a pledge "to support the nominees of the party," and that relator was excluded from participation in the State Democratic Convention at Dallas in September, instead of the State Democratic Convention at Beaumont in May, and the opinion is corrected to so read.

The opinion is also corrected to show that the Committee numbered the resolution "fourth," which, for convenience, was numbered "first" in the opinion.

These corrections are obviously and wholly immaterial to any conclusion announced in the original opinion.

After careful consideration of the motion, we adhere to the conclusions leading to the judgment heretofore entered, and the motion for rehearing is therefore overruled.

Opinion delivered June 4, 1930.