# IN THE SUPREME COURT OF TEXAS

No. 18-0660

IN RE OCCIDENTAL CHEMICAL CORPORATION,
OXY INGLESIDE ENERGY CENTER, LLC,
OXY INGLESIDE LPG TERMINAL LLC, AND
OXY INGLESIDE OIL TERMINAL LLC, RELATORS

ON PETITION FOR WRIT OF MANDAMUS

JUSTICE BOYD, joined by JUSTICE BLACKLOCK, dissenting.

"By constitutional design, this Court's primary role is to sit as the court of *last* resort in civil cases . . . ." *Ante* at ___ (emphasis added). In this case, Oxy[1] asks us to exercise original jurisdiction—to sit as a court of *first* resort—to determine in the first instance whether Oxy's piers, docks, and related facilities lie within (and are thus taxable by) San Patricio County or Nueces County. Yet as all the parties acknowledge, the Refugio County district court has scheduled a hearing to resolve that very issue on summary-judgment motions on October 24, 2018, just twelve days after the Court intervenes today. The record presents no "strong and special reason" for this Court to interfere with the ordinary litigation process on an artificially rushed timeline[2] to resolve a dispute the trial court is—as one might say—fixing to resolve. The lack of any "strong and special

---

[1] Collectively, Occidental Chemical Corporation; Oxy Ingleside Energy Center, LLC; Oxy Ingleside LPG Terminal LLC; and Oxy Ingleside Oil Terminal LLC.

[2] I share JUSTICE BROWN's "constitutional concerns about the statutorily imposed deadline for resolving this case." *See ante* at ___ (BROWN, J., concurring). Because I conclude the statutory grant of original jurisdiction over this case is itself unconstitutional, I join all but the first sentence of his opinion.

reason" does not just make the Court's decision to exercise original jurisdiction inadvisable, it makes the legislature's otherwise well-intentioned attempt to grant us original jurisdiction unconstitutional. Because the Court exercises jurisdiction the Constitution does not permit, I must respectfully dissent.

## I.
## Section 72.010

Oxy asserts that section 72.010 of the Texas Local Government Code—a "bracket bill" the legislature passed last year specifically to permit Oxy to file this case—grants this Court original jurisdiction. Section 72.010 authorizes a property owner to file suit in this Court to "establish the correct boundary between the taxing units" and "determine the amount of taxes owed on the property and the taxing unit or units to which the taxes are owed." TEX. LOC. GOV'T CODE § 72.010(c). Subsection (d) provides that this Court "has original jurisdiction to hear and determine [such] a suit . . . and may issue injunctive or declaratory relief in connection with the suit." *Id.* § 72.010(d). So as Oxy asserts and the Court concludes, the legislature has undoubtedly made the policy choice to grant this Court original jurisdiction to address Oxy's complaints.

But the question is not simply whether the legislature granted us original jurisdiction in section 72.010. Instead, we must consider whether the Texas Constitution authorized the legislature to grant us original jurisdiction as it did in section 72.010. However well-intentioned, the legislature simply "cannot confer a jurisdiction not permitted by the Constitution." *Love v. Wilcox*, 28 S.W.2d 515, 522 (Tex. 1930) (orig. proceeding) (citing *Marbury v. Madison*, 5 U.S. 137, 138 (1803); *Ex parte Towles*, 48 Tex. 413, 422 (1877)). The Constitution expressly authorizes the legislature to grant this Court original jurisdiction, but only "to issue writs of quo warranto and mandamus in such cases as may be specified." TEX. CONST. art. V, § 3(a). Section 72.010 does not

2

grant us jurisdiction "to issue writs of quo warranto or mandamus"; instead, it authorizes us to "establish the correct geographic boundary," "determine the amount of taxes owed," and "issue injunctive or declaratory relief." TEX. LOC. GOV'T CODE § 72.010(c)–(d).

Nevertheless, the Court holds that section 72.010 *impliedly* authorizes us to grant mandamus relief, relying on our decision in *In re Allcat Claims Service, L.P.*, 356 S.W.3d 455, 460 (Tex. 2011) (orig. proceeding). *Ante* at ___. Like section 72.010, the statute at issue in *Allcat* granted this Court original jurisdiction without expressing that we should or could use that jurisdiction to issue writs of quo warranto or mandamus. *Allcat*, 356 S.W.3d at 462. Making no effort to compare or contrast the two statutes, the Court summarily concludes today that, because the *Allcat* statute impliedly granted the Court original mandamus jurisdiction, section 72.010 does as well. *Ante* at ___.

The Court's reliance on *Allcat* raises far more complicated issues than its brief discussion suggests. We held that the *Allcat* statute impliedly granted this Court jurisdiction to issue a mandamus writ because it granted us "exclusive and original jurisdiction" over "all taxpayer suits challenging the constitutionality" of the state's franchise-tax act, and because Allcat sought "an order directing the Comptroller to refund part of the taxes it paid." *Allcat*, 356 S.W.3d at 462, 472. I find *Allcat*'s reasoning more creative than convincing, primarily because mandamus relief is not necessary to successfully challenge a statute's constitutionality, *see* TEX. CIV. PRAC. & REM. CODE §§ 37.004(a), .006(b), or to obtain a refund of unlawfully demanded franchise taxes, *see* TEX. TAX CODE §§ 112.052, .060. But accepting *Allcat* as our binding precedent, the Court's extension of *Allcat* to this case is even more creative and even less convincing. Mandamus is certainly not the only means to determine a boundary or to whom taxes are owed, and—unlike in *Allcat*—we cannot

resolve Oxy's refund claim in this case. Conditionally granting Oxy's petition for writ of mandamus, the Court orders Nueces County to "withdraw and cease from issuing tax assessments to Oxy," *ante* at ___, but it does not direct Nueces County to refund any taxes because, as Oxy agrees, Oxy must return to the lower courts in which it has pursued "administrative and legal remedies" to calculate and obtain any refund. *Ante* at ___. Nevertheless, I need not decide whether section 72.010 impliedly grants us original jurisdiction to issue a writ of mandamus because even if it does, no "strong and special reason" justifies our original jurisdiction here.

## II.
### Article V, Section 3(a)

Assuming that section 72.010 impliedly grants us original jurisdiction to issue a writ of mandamus, we must still determine whether that grant is constitutional. Because mandamus is an extraordinary remedy, and this Court's assertion of original jurisdiction over a request for such relief is even more extraordinary, we have consistently construed the Constitution to impose "certain limitations on the power of the Legislature to specify classes of cases which may be brought within the court's original jurisdiction." *Love*, 28 S.W.2d at 519. Specifically, we have long held that article V, section 3(a) authorizes the legislature to grant us original jurisdiction *only* for cases in which

    (1) "the right to the duty required to be performed by mandamus [is not] 'dependent upon the determination of any doubtful question of fact,'"

    (2) "the writ of quo warranto or mandamus [is] a proper or necessary process for enforcement of the right asserted," and

    (3) "some strong and special reason" exists "for the exercise of this extraordinary original jurisdiction."

4

*Id.* (quoting *Teat v. McGaughey*, 22 S. W. 302, 303 (Tex. 1893) (orig. proceeding), and citing *Pickle v. McCall*, 24 S.W.265, 266 (Tex. 1893) (orig. proceeding), and *Betts v. Johnson*, 73 S.W. 4, 5 (Tex. 1903) (orig. proceeding)).

I agree with the Court that section 72.010 does not require us to resolve any "doubtful question of fact" in this case. *Id.*; *see ante* at ___.[3] Whether mandamus relief is "proper or necessary" is a much closer call,[4] but I need not decide that issue because no "strong and special reason" justifies our "extraordinary original jurisdiction" in this case.

---

[3] Section 72.010 tasks the Court with resolving a boundary dispute, but the parties here do not dispute the material facts regarding the location, size, or nature of the piers and related facilities at issue. Under the Refugio County district court's 2003 judgment, which is final and binding on the counties, the resolution of this dispute depends on whether the piers constitute "artificial modifications" to "the point at which the waters of the bays meet the mainland at mean lower low tide" (the "shoreline"). *Ante* at ___. If they do, then they "form a part of San Patricio County" under the district court's 2003 judgment. *See ante* at ___. If they do not, then they form a part of Nueces County unless some other *legal* principle applies. To answer that question, we need only construe the 2003 judgment's language and apply it to the undisputed facts regarding the location, size, and nature of the piers and related facilities.

[4] The Court concludes that this case meets the second requirement because (1) in "this case as in *Allcat*, the right to mandamus relief is predicated on the resolution of [the] legal question" of which county is authorized to tax Oxy's piers and related facilities and (2) the Refugio County district court's jurisdiction to resolve that dispositive issue is "not entirely clear." *Ante* at ___. But the mere existence of a legal question—even a constitutional question— does not justify or require mandamus relief as opposed to, say, declaratory or injunctive relief, which section 72.010 *expressly* authorizes. And section 72.009 expressly grants the district court jurisdiction to "establish the common boundary line" and "determine where the boundary line is located." TEX. LOC. GOV'T CODE § 72.009.

Mandamus is proper "only to correct 'a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law.'" *City of Houston v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 577 (Tex. 2018) (quoting *In re Essex Ins. Co.*, 450 S.W.3d 524, 526 (Tex. 2014) (per curiam)). Considering the existence of a legitimate boundary dispute and the counties' proper reliance on preexisting statutory procedures to resolve that dispute, I am not convinced that the counties' refusal to refund the taxes pending a resolution of the dispute is either an abuse of discretion or a violation of a ministerial legal duty. On this point, I find *Allcat* far less indistinguishable than the Court suggests. The relator in *Allcat* asserted that the statute upon which the comptroller collected taxes from the relator was unconstitutional and thus void. If the statute was in fact unconstitutional, it was void ab initio, and the comptroller had no legal authority to collect or retain the taxes paid. *Allcat*, 356 S.W.3d at 462. Here, Oxy does not challenge the constitutionality or validity of any statute. Instead, Oxy asserts that one of the counties (it takes no position as to which one) lacks authority to tax the piers because the scope of the county's taxing jurisdiction does not encompass the piers. Until the boundary dispute is resolved, however, both counties, acting through their tax assessors, have a statutory duty to tax the piers if the piers lie within their boundaries. *See* TEX. TAX CODE § 6.23.

Contrary to the Court's assertion, I do not contend or suggest that the "counties have discretion to double tax taxpayers." *Ante* at ___. Although Oxy and other taxpayers may be double-taxed, the Court misconceives the issue because neither of the counties is double-taxing them. *See City of Pelly v. Harris Cty. Water Control & Imp. Dist. No. 7*, 198 S.W.2d 450, 454 (Tex. 1946) (holding no unconstitutional double-taxation occurred when two different

5

A "strong and special reason" for this Court to exercise original jurisdiction exists when a case "involves questions which are of general public interest and call for a speedy determination." *Betts*, 73 S.W. at 5. Even when the extraordinary remedy of mandamus relief is proper and necessary (that is, when the second constitutional requirement is satisfied), the relator must first pursue that relief "in the lower courts unless it is made plain that *urgent necessity* calls for the exercise of the original jurisdiction of the Supreme Court." *Love*, 28 S.W.2d at 521 (emphasis added). Absent such "urgent necessity," the relator must pursue its rights in the ordinary fashion: "a mandamus proceeding by suit in the district court, appealed to the Court of Civil Appeals, and brought to the Supreme Court" by petition for review. *Id.* "Where these ordinary remedies are complete and adequate, the extraordinary original jurisdiction of the Supreme Court . . . cannot be successfully invoked." *Id.* (citations omitted).

In response to these quotes from *Love*, the Court notes that "Oxy is not a party to that action"—meaning the section 72.009 suit between the counties in Refugio County—"and cannot

jurisdictions separately imposed two taxes); *cf. TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 179 (Tex. 2013) (discussing *Pelly* and clarifying unconstitutionality of double-taxation). Instead, each county, acting through its assessor, is taxing property it believes it has a duty to tax. Obviously, the piers cannot wholly lie within both counties' boundaries, and one of the counties' conclusions is incorrect. But the statutes on which the counties rely to assess the tax are constitutional and valid, and they impose on the counties a duty to collect the taxes on property within their boundaries. Although, as the Court concludes, Oxy's asserted "right to mandamus relief is predicated on the resolution of a legal question," the legal question here (whether the piers and related facilities lie within the boundaries of San Patricio County or Nueces County) goes to the *scope* of the counties' duty, not the *existence* of that duty. Section 72.009 provides the proper procedure to resolve that legal question, and the counties have appropriately sought to resolve that dispute using the legal process the law provides.

As for the Court's suggestion that section 72.009 may not grant the Refugio County district court sufficient jurisdiction to resolve the counties' dispute, the court of appeals has already held in this very case that it does, and we declined to review that decision. *See San Patricio Cty. v. Nueces Cty.*, 492 S.W.3d 476, 485 (Tex. App.—Corpus Christi 2016, pet. denied) (holding that section 72.009 grants the Refugio County district court jurisdiction to resolve all "issues necessary and incidental to the establishment of the common boundary line," including the issue of which county can tax Oxy's pier and other "Disputed Properties").

Nevertheless, because I conclude that no "strong and special reason" justifies our original jurisdiction, I need not flesh out all those issues and decide whether Oxy has established that one or both counties has abused its discretion or violated a legal duty or whether Oxy has an adequate remedy at law.

6

be," and "Oxy has no relief to pursue there [in the pending Refugio County suit] in an ordinary fashion or any other way." *Ante* at ___. This response strikingly reveals the Court's confusion and the reason for its error. The point we made clear in *Love* is this: Even if mandamus is a proper or necessary means to resolve Oxy's complaints, Oxy can and must file a petition seeking a writ of mandamus *in an appropriate district court* unless an "urgent necessity" creates a "strong a special reason" for it to seek that relief in this Court *first*. *Love*, 28 S.W.2d at 521. Even though Oxy is not a party to the counties' pending Refugio County suit, that suit affects whether Oxy can seek mandamus relief in this Court *first* because, as discussed below, the status of that suit—in particular, the imminent summary-judgment hearing to resolve the counties' dispute—negates any claim of the urgent necessity the Constitution requires for us to exercise *original* mandamus jurisdiction.

The Court asserts that the fact that Oxy is being "double-taxed" is "alone" a "'strong and special reason' for extraordinary mandamus relief," *ante* at ___, but it does not divorce that assessment from its concerns about how long the counties' boundary litigation has been pending. The Constitution, at least as construed in *Love* to require an "urgent necessity," does not authorize the legislature to permit anyone who alleges they are being "double-taxed" to file an original mandamus action in this Court. Nor does the history or status of the Refugio County litigation create the "urgent necessity" the Constitution requires.

The Court is obviously bothered by how long the counties' boundary litigation has been pending. *See ante* at ___. But the Court's repeated references to the "counties' 46-year history of boundary litigation," *ante* at ___, which once remained "pending for 17 years," *ante* at ___, is a red herring. Contrary to the Court's assertion, Oxy has not "wait[ed] 46 years" for a remedy. *Ante*

7

at ___. Although the *counties* have been engaged in litigation over their shared boundary since 1972, Oxy had no dispute until both counties began taxing the piers and related facilities in 2008. San Patricio County then promptly filed suit in Refugio County, seeking a determination of which county was properly taxing the piers. *Ante* at ___; *see* TEX. LOC. GOV'T CODE § 72.009 (authorizing counties to sue "an adjacent county to establish the common boundary line"). And to protect its rights, Oxy filed tax-protest suits against both counties under chapter 41 of the Tax Code, seeking a refund from whichever county loses the boundary dispute. *Ante* at ___; *see* TEX. TAX CODE § 41.41.

The delays in resolving the Refugio County suit have resulted primarily from an unsuccessful mandamus proceeding followed by a successful appeal from what turned out to be an improper venue transfer. *See San Patricio Cty.*, 492 S.W.3d at 478–82 (explaining litigation's history). The court of appeals resolved the venue issue in 2016, and we finally denied review of that decision on October 20, 2017. The Nueces County district court just entered an order transferring the case back to the Refugio County district court on April 11 of this year. On June 19, the counties jointly submitted a letter to the Refugio County district court proposing an expedited disposition on cross-motions for summary judgment, and the district court's hearing on those motions is now just twelve days away. Although the venue dispute may have created an unfortunate delay, no one contends that either county has acted in bad faith or pursued tactics intended primarily for delay. Instead, as Nueces County explains in its brief, both counties and the courts below have simply "followed proper trial and appellate procedure" to resolve their legitimate dispute.

8

More importantly, the questions of whether and why the counties' dispute regarding the piers and related facilities has lingered are mostly irrelevant to the issue of whether a "strong and special reason" existed for the legislature to authorize an original action in this Court. By the time the legislature enacted section 72.010 just last year, the court of appeals had remanded the counties' boundary litigation to Refugio County, and that decision was pending review in this Court. After we denied review, the case returned to the Refugio County district court that issued the 2003 judgment. As Nueces County asserts, no court is better suited to interpret and apply that judgment to resolve the present dispute than the court that drafted and entered it. With that hearing just days away, no "urgent necessity" provides a "strong and special reason" for "the exercise of the original jurisdiction of the Supreme Court." *Love*, 28 S.W.2d at 521.

The resolution of Oxy's dilemma necessarily depends on the counties' willingness to resolve their dispute. But nothing in this record suggests that either county has improperly delayed the Refugio County litigation or intends to delay it further, much less justifies the Court's suggestion that neither county "has shown a pressing interest in achieving a resolution." *Ante* at ___. To the contrary, within weeks after the courts (including this Court[5]) finally resolved the venue issue and returned the case to Refugio County, the counties jointly requested an expedited resolution on summary judgment. The imminent summary-judgment hearing should compel us to conclude that, if this Court is to ultimately resolve the dispositive issue, we will soon have that opportunity through the preferred and proper process—on a full record and after a "complete

---

[5] Nueces County's petition for review of the court of appeals' venue ruling pended in this Court for a year and three months—from July 27, 2016, until October 20, 2017.

vetting of the parties' potential arguments in the lower courts." *Pidgeon v. Turner*, 538 S.W.3d 73, 87 (Tex. 2017) (quoting *Hegar v. Tex. Small Tobacco Coal.*, 496 S.W.3d 778, 792 (Tex. 2016)).

I do not discount Oxy's (and similar property owners') likely frustration over litigation delays.[6] But in assessing whether an urgent necessity establishes a strong and special reason to authorize original mandamus jurisdiction, the Court discounts the status of the Refugio County litigation when the legislature enacted section 72.010 and wholly ignores the summary-judgment hearing that is imminent as we issue our decision.

Finally, the Court concludes that the history of the counties' Refugio County litigation and its impact on Oxy "raises an issue 'of general public interest' that 'call[s] for a speedy determination.'" *Ante* at ___ (quoting *Love*, 28 S.W.2d at 519). But the "general public interest" that required a "speedy determination" in *Love* derived from the relator's right to have his name placed on the ballot as the Democratic Party's candidate for Governor in an imminent election, which we concluded affected "the general rights and the important interests of the state and of the people," and which would be lost completely and forever if we did not exercise original jurisdiction. *Love*, 28 S.W.2d at 521. Although we have since recognized such general public interests in issues involving taxation, we did so only in cases involving state taxes that affected *all* limited partnerships and certain other unincorporated associations in the state, *Allcat*, 356 S.W.3d

---

[6] Although Oxy may justifiably express such frustration, it does not attempt to establish significant prejudice resulting from the delays. On that point, I note that, once the boundary dispute is resolved, Oxy will be entitled to recover all of the taxes it paid under protest to the losing county, plus interest. *See* TEX. TAX CODE §§ 111.064, 112.060(a).

10

at 458–59, or "not only millions of taxpayers but the public at large" and the "state fisc" itself, *In re Nestle USA, Inc.*, 387 S.W.3d 610, 617 (Tex. 2012) (orig. proceeding). By contrast, the issue in this case involves the fiscal interests of just one taxpayer[7] and two of Texas's 254 counties.

However much we may desire to defer to the legislature's policy choice in enacting section 72.010, and however sympathetic we may be to Oxy's desire for a quicker resolution than the ordinary litigation process has provided, neither we nor the legislature can create jurisdiction the Constitution does not permit. Article V, section 3(a) permits the legislature to grant this Court original jurisdiction to issue writs of mandamus, but our precedent confirms that any such writ must be not only proper and necessary, but *urgently* necessary. "I would not sacrifice that principle on the altar of expediency," *Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337 U.S. 582, 645 (1949) (Vinson, C.J., dissenting), especially when, as here, the issue is already teed up in the district court and that court is scheduled to address it within days.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: October 12, 2018

---

[7] Although section 72.010 applies to any property owner affected by the counties' boundary dispute and both counties have apparently taxed others, only Oxy has sought to take advantage of the statute by filing this suit.