Justice WILLETT,
joined by Justice LEHRMANN, concurring in part and dissenting in part.
Our system of government endows judges with a genuinely stunning power— that of judicial review, the power to declare laws unconstitutional. But this power, the “proper and peculiar province of the courts,”[1] is by no means boundless. The Texas Constitution that defines our judicial authority also delimits it. And one constitutional curb on judicial power is that of jurisdiction — our very authority to decide cases in the first place.
Ultimately, it falls to us, the courts, to police our own jurisdiction. It is a responsibility rooted in renunciation, a refusal to exert power over disputes not properly before us. Rare is a government official who disclaims power, but liberties are often secured best by studied inaction rather than hurried action.
[[Image here]]
Today’s decision may well be the Term’s most consequential, not because of the dollar amounts at stake, but because of the constitutional principles at stake — and the restraint the Court fails, regrettably, to exercise. With little fanfare, and rushed by an arguably unconstitutional “deadline,” the Court expands the limits of mandamus far beyond the limits of our Constitution. Along the way, the Court redefines one of mandamus’s two elements, making it far easier for parties to assert mandamus jurisdiction.
The upshot is that litigants will be able to attack a statute’s constitutionality via mandamus, a remedy we once could honestly describe as “extraordinary.”[2] Now, any time the Legislature desires a quick answer, it can leapfrog lower-court review altogether and declare virtually any case within this Court’s limited original jurisdiction. As explained below, I believe we *475 lack exclusive original mandamus jurisdiction here.
The Court, however, is perhaps not alone in its overreaching. The Legislature, like the judiciary, is bound by the Constitution, which curbs legislative power as surely as it curbs judicial power. Specifically, the Separation of Powers provision limits the Legislature’s ability to interfere with the inner workings of the judiciary, and vice versa. The judicial branch is the Legislature’s constitutional partner, but not a junior partner.
The Act in this case purports to dictate how and when the Supreme Court must perform its judicial duties, by ordering the Court to hear this case — and more, to decide it within 120 days of filing. The parties have not addressed whether such a deadline can be squared with our Constitution’s most cardinal principle: that powers be separated among supposedly co-equal branches of government. Perhaps a future case will present the issue squarely.
I agree with the Court that we lack jurisdiction over Allcat’s as-applied, challenge (based on the limits in the Constitution, not simply those in the Act itself) and its request for attorney fees. As for All-cat’s facial challenge, we can only reach it by overreaching. From that part of today’s opinion, which I believe disregards the Constitution’s limits on our jurisdiction, I respectfully dissent.
I.The Court Lacks Original Mandamus Jurisdiction over Relators’ Facial Challenge.
The Court asserts exclusive original mandamus jurisdiction even though:
1. no statute grants us such jurisdiction;
2. the Constitution expressly requires such a statute; and
3. other statutes explicitly forbid mandamus relief in taxpayer suits like this.
More disconcerting, the Court then declares mandamus relief appropriate even though there is no “abuse of discretion” for us to correct nor any “ministerial duty” for us to enforce.
In short, the Court dramatically redefines not just the limits on our mandamus jurisdiction, but one of the essential elements of what once was deemed an “extraordinary” form of relief.[3]
A. No Statute Gives Us Jurisdiction to Grant Mandamus Relief.
The Court does not, and cannot, identify any explicit pronouncement from the Legislature giving us original jurisdiction to grant mandamus relief in this case.
This sounds technical but is hardly insignificant. The Constitution restricts our original jurisdiction, meaning we cannot assert what we have not been assigned. Our original jurisdiction is limited to just those cases where the Legislature has expressly conferred on us the authority to issue writs of quo warranto or mandamus. The Legislature has not done so here.
1. Before We Can Exercise Original Mandamus Jurisdiction, the Legislature Must Give Us Authority to Issue Mandamus Relief.
The last sentence of Article V, Section 3(a) covers our original jurisdiction:
The Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State.[4]
*476 Our original jurisdiction is not self-effectuating. We can exercise only what the Legislature has conferred, and it can confer only what the Constitution allows it to confer: jurisdiction “to issue writs of quo warranto and mandamus in such cases as may be specified.”[5]
2. The Act Does Not Confer Such Jurisdiction on This Court.
In this case, section 24(a) of the Act purports to give us exclusive original jurisdiction over any challenge to the Act’s constitutionality: “The supreme court has exclusive and original jurisdiction over a challenge to the constitutionality of this Act or any part of this Act and may issue injunctive or declaratory relief in connection with the challenge.”[6]
Notably, section 24(a) makes no mention of giving this Court original jurisdiction to issue writs of mandamus. In fact, the word “mandamus” does not appear anywhere in the Act.[7]
My question, then, is this: Given that the only way we can have original jurisdiction over a case is if the Legislature confers on us original jurisdiction to issue writs of mandamus (or quo warranto), and given that the Act makes no mention of giving this Court such jurisdiction, where does our original mandamus jurisdiction over this case come from?
3. A Grant of Exclusive Original Jurisdiction Is Not the Same as a Grant of Jurisdiction to Issue a Writ of Mandamus.
The Court contends that we have original mandamus jurisdiction over Allcat’s facial challenge because (1) “[t]he Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions,” (2) mandamus is “proper or necessary” here, and (3) “[i]f the grant of jurisdiction or the relief authorized in the statute exceeds the limits of Article Y, Section 3(a), then we simply exercise as much jurisdiction over the case as the Constitution allows, as we did in Love.”[8]
Unpacking these statements, it appears the Court uses a three-step process to conclude we have jurisdiction.
Step 1: Under our Constitution and Love v. Wilcox, the Legislature can confer on us original jurisdiction to issue writs of mandamus or quo war-ranto (but it cannot give us any more original jurisdiction).
Step 2: If the Legislature “expresses legislative intent” to grant us original jurisdiction, and if mandamus is deemed “proper or necessary,” then we have such original jurisdiction to whatever extent the Constitution allows.
Step 3: If the Legislature confers more jurisdiction than the Constitution allows, or authorizes us to issue relief that the Constitution doesn’t, we simply read the jurisdictional grant narrowly, “exercising] [only] as much jurisdiction ... as the Constitution allows.”
The problem is that Steps 2 and 3 do not flow from Step 1. In fact, they are logically incompatible with it. When it comes to this Court’s original jurisdiction, the Constitution gives the Legislature an extra-thin slice of conferral authority: It can do no more than “confer original jurisdiction *477 ... to issue writs of quo warranto and mandamus.”[9] The Act at issue here does not even attempt to do this.[10]
This fact sets this case apart from Love. There, the legislative conferral stated that “[t]he Supreme Court shall have the power, or authority, or jurisdiction, to issue the Writ of Mandamus, or any other Mandatory or compulsory Writ or Process.”[11] It thus gave the Court, in clear and specific terms, the authority and jurisdiction to issue writs of mandamus in certain situations.[12] The problem in that case was that the Legislature gave us too much authority. Its express conferral went beyond the writs we could issue pursuant to our original jurisdiction, to those we could not. We concluded the Legislature had made a proper, express grant of original jurisdiction — to issue writs of mandamus in original proceedings — along with an improper grant — to issue, for example, original writs of injunction.[13]
Here, by contrast, the Act does not make any proper grant of original jurisdiction; it simply announces that this Court “has exclusive and original jurisdiction over any challenge to the Act’s constitutionality.” [14] The Act, unlike the statute in Love, makes no mention of giving us the “power, or authority, or jurisdiction” to issue writs of mandamus in such cases.[15] Yet under the Constitution and our own caselaw, this is the only original jurisdiction the Legislature can confer on us.[16]
Thus, the Court today concocts a proper grant of original jurisdiction out of an Act that makes only an improper one. The Court justifies this move by noting that the Act exhibits clear “legislative intent” that we be the Court of first and last resort for challenges to the Act’s constitutionality, and by noting that mandamus is “proper or necessary” here.[17] Never mind that neither “legislative intent,” nor our independent determination that mandamus is “proper or necessary,” has much to do with the paramount constitutional point: Under Article V, Section 3(a), the Legislature may only confer on us original jurisdiction to issue writs of mandamus or quo warranto,[18] If the Legislature fails to do so, I would not, given the Constitution’s restrictive language, improvise a conferral *478 of original jurisdiction that is simply not there.
The consequence of today’s rather striking departure from our precedent is that only two limiting factors remain on our original jurisdiction: (1) the Court’s ability to discern “legislative intent” to confer such jurisdiction, and (2) the Court’s ability to reimagine the underlying dispute as a mandamus case.[19] And these, of course, are only as limited as the Court’s willingness to remake mandamus into something more ordinary than extraordinary.
In sum, the Court today discovers original mandamus authority in a conferral statute that says nothing about mandamus authority. The Court identifies no other source of jurisdiction. Bereft of a proper grant of original jurisdiction, the Court errs by exercising jurisdiction over Allcat’s facial challenge.
B. Chapter 112 of the Tax Code Sets the Rules for Taxpayer Suits and Explicitly Bars Mandamus Relief; the Act Makes No Exception.
The Court takes upon itself the daunting task of finding original mandamus jurisdiction here where no statute has expressly conferred it. Making matters more complicated is the fact that this suit is a challenge to a tax law. And the Legislature has already created a number of statutory rules, restrictions, and requirements that apply in such taxpayer suits. Chapter 112 of the Tax Code sets forth those restrictions.[20] They limit where and when a taxpayer can bring her suit, what prerequisites she must meet before filing, and what relief she is (and is not) entitled to. And while the Act here creates certain exceptions to those rules, the Act does not create an exception to Chapter 112’s prohibition on mandamus relief in taxpayer suits.[21]
1. Chapter 112 Prohibits Mandamus Relief in Suits Like This.
The language of the relevant provision— section 112.108 of the Tax Code — is so specific that it merits reproducing in its entirety:
Except for a restraining order or injunction issued as provided by this subchap-ter, a court may not issue a restraining order, injunction, declaratory judgment, writ of mandamus or prohibition, order requiring the payment of taxes or fees into the registry or custody of the court, or other similar legal or equitable relief against the state or a state agency relating to the applicability, assessment, collection, or constitutionality of a tax or fee covered by this subchapter or the amount of the tax or fee due, provided, however, that after filing an oath of inability to pay the tax, penalties, and interest due, a party may be excused from the requirement of prepayment of tax as a prerequisite to appeal if the court, after notice and hearing, finds that such prepayment would constitute an unreasonable restraint on the party’s right of access to the courts. The court may grant such relief as may be reasonably required by the circumstances. A grant of declaratory relief against the state or a state agency shall not entitle *479 the winning party to recover attorney fees.[22]
Thus, section 112.108 explicitly prohibits any court from granting injunctive or declaratory relief or issuing any writ of mandamus or any other legal or equitable relief not already allowed elsewhere in Chapter 112.[23]
2. Section 24(a) of the Act, While Purporting to Allow Certain Relief Notwithstanding Chapter 112, Does Not Mention Mandamus.
Section 24(a) purports to create an exception to this “no relief’ rule. In particular, it announces that this Court can issue declaratory or injunctive relief in connection with a constitutional challenge made in a specific breed of taxpayer suit — specifically, challenges to the Act[24] But section 24(a) does not create an exception to the Tax Code’s prohibition on courts, including this Court, issuing writs of mandamus.[25]
This Court generally has the authority to issue mandamus relief against government officials,[26] but Chapter 112 of the Tax Code creates an exception to that power, taking it away in the limited context of taxpayer suits. The Act — specifically, section 24(a) — does not give it back. Indeed, as discussed above, the Act doesn’t mention mandamus anywhere.[27] As the Act does not establish an “exception to the exception,” we lack mandamus authority here.[28]
3. The Moral of the Story: The Tax Code Prohibits Us from Exercising Mandamus Jurisdiction over This Case.
The plain language of Chapter 112 prohibits courts from granting mandamus re *480 lief in taxpayer suits like this. The Act here does not make an exception to this rule, even while it envisions the availability of injunctive and declaratory relief.
The Court seems fully aware of this. In fact, section 112.108’s bar on mandamus relief provides part of the foundation for the Court’s conclusion that we lack jurisdiction over Allcat’s as applied challenge.[29]
To my mind, what’s good for the goose is good for the gander. Or, in this case, the opposite: If it’s no good for the gander, it’s no good for the goose either. Just as the Tax Code’s bar on mandamus relief forbids us from exercising original mandamus jurisdiction over Allcat’s as-applied challenge, it also bars us from exercising such jurisdiction over Allcat’s facial challenge.
C. Mandamus is Inappropriate in a Case Like This, Because There Is No Ministerial Duty to Compel the Executive to Perform.
I come now to what I see as the most tenuous part of the Court’s holding. For the Court to conclude that we can exercise exclusive original mandamus jurisdiction here, it must first shoehorn this case into the “mandamus” category. But under our mandamus jurisprudence, it is impossible to do so.
This is not a mandamus proceeding because one of the two elements required for mandamus relief is entirely absent. Mandamus is appropriate only to correct an abuse of discretion or to compel a government officer to perform a ministerial duty.[30] Neither is present here. The Comptroller — the officer Allcat seeks to mandamus — has neither abused her discretion nor failed to perform a ministerial duty.
My view is uncomplicated: Deciding whether a statute is constitutional is not the proper subject of a mandamus proceeding. And that’s all this case is — a garden-variety constitutional challenge. There is no ministerial duty to compel, no abuse of discretion to correct. There is only Allcat’s argument that the Act is unconstitutional. This is simply not a mandamus case.
1. The Elements of Mandamus
To obtain mandamus relief, a relator must demonstrate two things: (1) a lower court or government official committed a clear abuse of discretion or has failed to perform a ministerial duty;[31] and (2) he has no adequate remedy at law and therefore needs the writ.[32] My primary quibble is with the first element.
The purpose of mandamus — and the role it is invoked to play here — is to compel a government agent to perform a ministerial act or duty.[33] But this is, for lack of a better term, a truly extraordinary remedy: By issuing the writ, the Court essentially controls the conduct of a government officer by telling her what she must do.[34] Therefore, the writ will issue only when the duty to be performed is “clear and definite and involves the exercise of no discretion — that is, when the act is minis *481 terial.”[35] The meaning of “ministerial act” is terribly important because it helps set the boundaries of the judiciary’s power to issue writs of mandamus. Thus, we have long defined that term narrowly:
The distinction between ministerial and judicial and other official acts seems to be that where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial; but where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial.[36]
2. The Alleged “Duty” that the Court Identifies
The Court suggests that Allcat seeks a writ of mandamus compelling the Comptroller to refund taxes Allcat paid under the Act; this alleged duty, if it exists, flows from the fact that the Act is unconstitutional.[37] The Court denies the writ: Because Allcat failed to show the Act is unconstitutional, “Allcat has not shown entitlement to a refund.”[38] That is, Allcat has failed to prove the existence of any ministerial duty for us to compel the Comptroller to perform.
The only problem with the Court’s reasoning is that it is circular. To qualify as a “mandamus” ease, there must already exist, at the time of filing, a ministerial duty that the petitioner wants enforced. But the Comptroller does not have a duty to pay a refund on an unconstitutional tax until that tax is first declared unconstitutional. Unless and until this happens, there neither is nor can be any duty to issue a refund, precisely because there is no “unconstitutional” tax. There is, simply, a tax, which is presumptively constitutional until proven otherwise.[39]
The duty the Court identifies — and uses to satisfy the first element of mandamus— is a conditional duty: the duty to refund taxes paid on an unconstitutional law if that law turns out to be unconstitutional. But a conditional duty is not a ministerial duty correctable by mandamus. That is, the conditional duty to issue a refund for a potentially unconstitutional tax cannot provide the basis for jurisdiction over a mandamus proceeding challenging the constitutionality of that same tax.
The Court turns for support to our decision in LeCroy v. Hanlon.[40] But LeCroy was not even an original proceeding — the trial court there had granted a writ of mandamus, but we did not. Nor were we ever asked to review the trial court’s decision to issue the writ, because the petitioner (the State, against whom the writ had been issued) only sought review of the *482 injunctive and declaratory relief that the trial court had granted.[41] More importantly, we did not hold in LeCroy that mandamus is an appropriate vehicle for attacking the constitutionality of a statute. In that case, we focused solely on the merits of the parties’ constitutional arguments. In fact, the word “mandamus” appears just twice in the entire opinion; both instances occur during our discussion of the case’s procedural history.[42]
The only other case the Court cites is Cramer v. Sheppard,.[43] But like LeCroy, Cramer provides no support for the proposition that the constitutionality of a statute is an appropriate subject for a mandamus proceeding. The Court is correct that in Cramer we mandamused the Comptroller to make a payment he had refused to make.[44] But mandamus did not issue to stop the Comptroller from enforcing what turned out to be an unconstitutional statute. In fact, no party even made a constitutional argument in Cramer — much less attacked the constitutionality of a statute.[45]
The “duty” the Court identifies, then, is not a mandamus-able one. Yet for this case to fall into the “mandamus” category — which it must, before we can exercise exclusive original mandamus jurisdiction— there must have existed a ministerial duty, owed by the Comptroller to Allcat, at the time Allcat filed its case.
3. The Alleged “Duty” that Allcat Identifies
Allcat does allege such a duty. In its own words, Allcat seeks a writ of mandamus compelling the Comptroller and the Attorney General to do their constitutional duty “to preserve, protect, and defend the Constitution”[46] — by refusing to enforce this (allegedly) unconstitutional tax.
The problem for Allcat is that this alleged “duty” fails our “precision and certainty” test for ministerial duties — nowhere is it defined “with such precision and certainty as to leave nothing to the exercise of discretion or judgment.”[47] There is no statute or case to cite, no clear statement of a duty that an executive must independently sit in judgment of the constitutionality of every statute she is charged with enforcing, and refuse to enforce statutes she unilaterally concludes are unconstitutional.
4. The Comptroller’s Actual Duty
I do not mean to suggest that this case is totally devoid of ministerial duties. As a matter of fact, the Comptroller does have a duty here, a solemn one: to enforce the laws that the Legislature has charged her with enforcing. Indeed, our Constitution is designed such that core legislative power- — the power to enact laws — is vested in the Legislature, while the executive is charged with enforcing those laws.[48] The power of suspending laws — of refusing to enforce them — is vested solely in the Legislature.[49] As the Comptroller argued, if the Separation of Powers provision means anything, it is that the Executive must enforce the laws that the Legislature *483 passes, unless and until the judiciary says otherwise.
5. The Rare Exception: Corsicana Cotton Mills
There is a narrow exception to this general rule. If the Executive is called upon to enforce an unconstitutional law, she can refuse to enforce it, and she can use her determination that the law is unconstitutional as a defense in a mandamus proceeding to compel her to enforce the law.[50] This was our holding in Corsicana Cotton Mills, Inc. v. Sheppard.[51]
There, the Legislature had passed a law requiring the Comptroller to reimburse a Texas corporation for erroneously paid franchise taxes. Apparently, the corporation had been overpaying its taxes for years. (It was undisputed that this overpayment was the corporation’s fault and that no State agent had ever done anything to induce it.[52]) When the corporation realized its error, it lobbied the Legislature for a state warrant for repayment.[53] The Legislature complied.[54]
The dispute arose when the Comptroller refused to enforce the statute. That is to say, he refused to repay the corporation. Thus, the corporation sought a writ of mandamus in an original proceeding in this Court to compel the Comptroller to obey the statute and make the legislatively required payment.[55]
The Comptroller argued the statute was unconstitutional.[56] We agreed and refused to issue the writ. We concluded that “[w]hen a legislative act requires an officer to perform a ministerial duty, he should perform it if the act is not unconstitutional.”[57] At the same time, we noted that,
When the law requires an officer to act, although the act be ministerial merely, if he is directly responsible for his official acts he may refuse to act, if in his judgment the law is in conflict with some constitutional provision, and, in case proceedings are instituted to coerce him, he may set up the supposed defect in the law as a defense.[58]
6. Allcat’s Approach Turns Corsicana Cotton Mills on Its Head.
There is a major difference between the approach that Allcat advocates, and the one we adopted in Corsicana Cotton Mills. To use the Comptroller’s parlance, this is the difference between using the law as a sword, and using it as a shield. Under the latter approach, the Executive can defend herself in a mandamus action, whereby a party seeks to compel her to enforce a statute, by arguing that in her judgment the law is unconstitutional. This is the approach we endorsed in Corsicana Cotton Mills.
Under Allcat’s approach, a relator can use its own determination that a law is unconstitutional as a sword to compel the Executive not to enforce a law that the relator itself has determined to be unconstitutional.
The fundamental difference here between the two approaches is that Allcat is *484 not seeking to mandamus the Comptroller to perform a ministerial duty. Yet this is the one and only species of duty that we can mandamus the Executive to perform.[59] The “duty” that Allcat seeks to enforce involyes the Comptroller’s independent, reasoned “judgment [that] the law is in conflict with some constitutional provision.” [60] Absent a clear and immediately relevant pronouncement by a court on a statute’s constitutionality, the only possible way the Executive can conclude that a statute is unconstitutional, and that she should therefore not enforce it, is by exercising judgment. By definition, this is not a ministerial duty or action.
Nor can I see how it can possibly be an abuse of discretion for the Comptroller to enforce a statute that no court has held unconstitutional.
Allcat does not cite any precedent from this jurisdiction to the contrary. Probably, it cannot. This may explain why the Court characterizes the alleged “duty” here in the way it does, rather than adopting Allcat’s approach and simply announcing that the Executive has a mandamus-able, nondiscretionary duty to independently judge the constitutionality of statutes, and to refrain from enforcing any she suspects are invalid.
But there are two hiccups with the Court’s approach. First, this duty is not the one that Allcat identifies and seeks to enforce. Second, as discussed above, it is logically impossible for such a duty to exist until after a court has first struck down the underlying law as unconstitutional. Thus, to have any hope of transforming this non-mandamus case into a mandamus case, the Court seems logically required to adopt Allcat’s position because, in order for us to exercise mandamus jurisdiction here, there must be an abuse of discretion or a ministerial duty to be compelled at the time Allcat filed suit.[61] Under Allcat’s approach, at least, the Court’s jurisdiction is not dependent on how it decides the merits of the case. The only problem with that approach is that the “duty” it turns on is nonexistent under Texas law.
7. Conclusion: The Court Errs in Exercising Mandamus Jurisdiction.
Allcat seeks a writ of mandamus to compel the Comptroller to perform a ministerial duty she does not have. The Court, perhaps in an attempt to navigate around this problem, recharacterizes the mandamus that Allcat seeks. But the duty the Court identifies logically cannot exist until after we first decide the merits of Allcat’s suit. The bottom line is, neither “duty” satisfies the first element of mandamus.
It’s hardly a mystery why no support exists for either position. Mandamus is (or is supposed to be) an extraordinary remedy, used only to correct a clear abuse of discretion or to compel government officers to perform a duty that is wholly non-discretionary. Mandamus is not a jurisdictional talisman that parties can wave to produce instant Supreme Court review.
The consequence of today’s holding is to completely overhaul this element of mandamus, thus making mandamus relief far more available and inviting increasing resort to mandamus proceedings in this Court. Not long ago, one of my colleagues lamented that the Court was dragging Texas into “a whole new world” of manda *485 mus practice.[62] He criticized the Court for stretching the writ’s second element (“no adequate remedy at law”) beyond what he believed our caselaw allowed.[63] Today, the Court turns its sights to mandamus’s first element, and in my view dismantles an important limit on the judiciary’s writ power. I fear that the lure of instant Supreme Court review of select legislation will prove increasingly irresistible.
In conjunction with the Court’s expansive holding that we have original mandamus jurisdiction even absent express conferral, today’s mandamus makeover virtually guarantees that parties who crave a quick final answer to their constitutional questions can now make a beeline for this Court, bypassing the normal judicial process, so long as there’s even a whiff of “intent” that the Legislature wanted it to be so.[64]
The Court identifies only one potential source of jurisdiction — a legislative declaration that we have exclusive original jurisdiction over cases like this. But this legislative conferral is invalid because it gives us original jurisdiction the Constitution does not allow, and it fails to give us the only type of original jurisdiction the Constitution does allow. Accordingly, I respectfully dissent from the Court’s conclusion that we have jurisdiction over All-cat’s facial challenge.
II. Constitutional Postscript — The Act’s 120-Day “Deadline” for This Court’s Decision Raises Separation of Powers Concerns.
Section 24(b) of the Act declares that this Court “shall rule on a challenge filed under this section on or before the 120th day after the date the challenge is filed.”[65] The Court does not discuss the deadline, as no party raised it (unsurprising, as the Court itself is the “party” most directly affected). That said, such a deadline at minimum raises a constitutional eyebrow.
The Texas Constitution, in a single sentence, declares an emphatic and elemental principle: The powers of government are divided among three distinct branches, and no branch may exercise the powers of another unless the Constitution expressly allows ⅞.[66] In fact, our explicit Separation *486 of Powers provision — something the U.S. Constitution lacks[67] — prohibits not just the exercise of one branch’s powers by another branch, but also any interference with another branch’s exercise of its own authority.[68]
Section 24(b) arguably does precisely that. By setting a hard-and-fast deadline for deciding a case, it threatens to interfere with our sworn adjudicatory duties under our Constitution. Imagine if the constitutional tables were turned and this Court purported to dictate the time and manner of legislative decision-making, if we tried to seize control of the legislative calendar and prescribe in minute detail how, when, in what numbers, in what committees, for what purposes, or for how long elected lawmakers could meet (or, for that matter, what laws they could and could not consider). The outcry would be deafening — and rightly so.
Preservation of the judiciary as a coequal branch is vital because Texans look to the courts — not least to this Court — to safeguard their liberties and legal rights, check abuses of authority by other branches, and preserve our constitutional framework. In other words, a judiciary cannot secure others’ freedom without first securing its own. Since our Constitution vests the judicial power in the judiciary alone *487 and mandates that we exercise the judicial power of the State,[69] this Court — and every Texas court — must jealously (and zealously) insist on judicial independence and a genuinely co-equal system of government.
Section 24(b) is obviously well meaning, demanding a swift answer so lawmakers and taxpayers alike can act with certainty and alacrity. I understand the impulse; more, I commend it:
To be sure, Members of the Texas Legislature have sworn to ‘preserve, protect, and defend the Constitution and laws of the United States and of this State,’ and they doubtless believe their enactments honor basic constitutional guarantees. I never second-guess the Legislature’s motives and goodwill (and have never needed to); we are blessed with 181 lawmakers who serve Texas with full hearts.[70]
But courts must stand guard against drip-by-drip incursions against judicial independence, however ostensibly benign and laudable.
A. Application, and Limits, of the Separation of Powers Doctrine — in Texas and Beyond
Thankfully, we have seldom had occasion to review a statute that tells us what to do and when to do it. The few times we have considered the meaning of the Separation of Powers provision as it relates to the legislative and judicial branches, it has generally been in the context of laws that delegated allegedly judicial functions to other branches.[71]
Our general rule is that a constitutional flag is raised when the legislative (or executive) branch interferes with “the functioning of the judicial process in a field constitutionally committed to the control of the courts.”[72] Thus, “the controlling factor” for determining whether another branch has encroached vis-a-vis the judiciary is “the presence or absence of interference with effective judicial control” of tasks that are inherently judicial.[73]
I. At the Limits: Judicial Rulemaking by the Legislature, and by the Judiciary
Occasionally, our Constitution, notwithstanding its three-way split of government power, lets one branch exercise a power that arguably belongs to another.[74] For *488 example, while the Constitution lets the judiciary promulgate rules for the court system,[75] it allows the Legislature to override those rules.[76] It even allows the Legislature to cut judicial rules out of whole cloth.[77]
But this power is not limitless. On several occasions, the Court of Criminal Appeals has struck down legislatively imposed judicial rules for violating the Separation of Powers provision.[78] Just as we have held that interfering with the “functioning of the judicial process” violates the separation of powers,[79] our sister High Court has balked when the Legislature “unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.”[80]
In Armadillo Bail Bonds v. State, for example, the Court of Criminal Appeals considered a law that restricted district courts’ ability to enter a final judgment when a criminal defendant forfeited his bail bond.[81] Specifically, the law barred the court from entering final judgment for at least eighteen months after forfeiture.[82] To guide its analysis, the Court posed two questions: First, is the law grounded in the Legislature’s own constitutionally assigned powers?[83] Second, even if so, does the law unduly interfere, or even threaten to unduly interfere, with the judiciary’s effective exercise of its constitutionally assigned powers?[84]
The Court of Criminal Appeals struck down that temporal restriction as an unconstitutional encroachment on one of the judiciary’s core functions: rendering judgments.[85] The Court went so far as to note that upholding the Legislature’s rule would necessarily pull the judiciary down a slippery slope: If the Legislature truly had the power to prevent the court from entering judgment for eighteen months, then it could keep the Court from ever entering a final judgment.[86]
The Court’s point seems to be this: The Constitution may give the Legislature authority over what rules the courts use, but rendering judgment and deciding questions of law are core judicial functions beyond the Legislature’s grasp.[87] The separation of powers bars the Legislature from “infringing] upon the substantive rights of the Judicial department under the guise of establishing ‘rules of court,’ ” precisely because that would “render[ ] the separation of powers doctrine meaningless.”[88] Thus, the Separation of Powers clause bars the Legislature from hindering our ability to render judgment or decide *489 questions of law — even though the Legislature has the constitutional authority to create rules that would otherwise do just that.[89]
2. Other Jurisdictions Overwhelmingly Agree.
So far as I can tell, other states’ courts are virtually unanimous on this point. With one lonely exception,[90] every single high court has concluded it is an inherently judicial task to determine when to render a judicial decision, and the separation of powers bars legislatures from telling courts when to do so.[91]
A factually similar case from the Supreme Court of Montana is particularly instructive. There, a statute essentially required district court judges and supreme court justices to write and issue any opinion within 120 days of when the case was filed.[92] After discussing many decisions from other jurisdictions striking down such laws, the Montana high court did the same. The court concluded that the law unconstitutionally interfered with the judiciary’s internal operations;[93] therefore, it violated Montana’s separation of powers provision — a provision that closely resembles our own.[94] The judiciary, and the judiciary alone, should decide when a judicial decision should issue.[95]
The court drove home its message with this intriguing analogy: It likened the legislature’s deadline-setting for the judiciary, to the judiciary telling the legislature how to run its internal operations. The legislature’s telling the courts when to render decisions was exactly the same “as if the judiciary would impose limitations on the legislature ... such as the number of committees, the time within which a committee must act, the time each legislator must attend sessions, limiting the time of discussion, limiting the time one bill must *490 pass from one house to the other,” and so forth.[96] The judiciary could no more tell the Legislature how to do such things than the Legislature could tell the courts the time and manner in which they must perform their core functions of rendering judgments and deciding questions of law. Such actions by definition offend the separation of powers.
“There are spheres of activity so fundamental and so necessary to a court, so inherent in its very nature as a court, that to divest it of its absolute command within these spheres is to make meaningless the very phrase judicial power.”[97] Granted, our Constitution — like the constitutions in many other states — gives the Legislature ultimate authority over setting the rules of court. But there exists “a realm of proceedings which are so vital to the efficient functioning of a court as to be beyond legislative power.”[98] This is an area of “minimum functional integrity of the courts, what is essential to the existence, dignity and functions of the court as a constitutional tribunal.”[99] The overarching principle seems to be this: “Any statute which moves so far into this realm of judicial affairs as to dictate to a judge how he shall judge or how he shall comport himself in judging or which seeks to surround the act of judging with hampering conditions clearly offends the constitutional scheme of the separation of powers and will be held invalid.”[100]
The reason why is simple and clear to someone committed to freedom and limited government. It is the principle articulated by Adams, Blackstone, Madison, and Montesquieu: The best way to avoid tyranny and to guarantee the rights and freedom of the people is to keep the powers of the government separate, and to ensure that no single branch ever anoints itself with so much power that it can dominate the other branches and, eventually, the people.
B. Besides Implicating Separation of Powers Concerns, Section 24(b) Collides with Pragmatic and Principled Concerns, Too.
We have held the Legislature violates the Separation of Powers provision when it thwarts “the functioning of the judicial process in a field constitutionally committed to the control of the courts.”[101] The question, again not raised by any of the parties (though the answer seems rather self-evident), is whether a core function of the judiciary is to render judgments and to issue reasoned judicial opinions that clarify the law and help guide the actions of millions of Texans scattered across 254 counties.
Does section 24(b) interfere with our ability to do this by setting an arbitrary deadline for deciding cases? At first blush, it would seem the 120-day deadline impacts the functioning of the judiciary in one of the simplest ways imaginable: by telling us how to manage our own affairs. The Legislature would rightly take exception if this Court, or any court, dictated to them the fine details of how they carry out their oaths of office — prescribing by judicial fiat precisely how our 181 elected legislators ought to legislate. This Court would never contemplate intruding so deeply into the Legislature’s internal oper *491 ations as to commandeer powers that are inherently legislative.
One pragmatic argument against a short-fuse deadline is that 120 days from initial filing may simply not be enough time to render a surpassingly thoughtful and well-reasoned decision. Such adjudicatory work is, undeniably, one of our bread-and-butter core functions. Ours is government of laws, but what use are courts if they cannot give each matter the full attention it requires, to think through every aspect of every relevant question of fact and law, to ensure that the correct outcome (in their opinion, if no one else’s) is reached and that their analysis is regarded as exhaustive and scholarly?
Four months — 120 days — might seem like plenty of time to decide a case. And no doubt many courts can and should move faster. This Court has commendably erased a backlog that had persisted for years, and we began the current fiscal year on September 1 with the fewest cases held over in recorded history. But the truth is that, generally speaking, 120 days from initial filing is rarely enough time for a Supreme Court case to be decided. Procedurally under our rules, there are many, many steps that must occur — cumulatively taking at least 110 days — all before the Court even hears oral argument, much less researches and drafts competing opinions and refines them into finished products.
Under our rules, once the petitioner files his petition, the respondent gets 30 days to file a response (though he routinely requests an extension, or two, or more), and the petitioner another 15 days to file a reply to the response (though he, too, often seeks an extension or two).[102] If we then request full briefing, the parties get another 65 days between them to file opening, response, and reply briefs on the merits (again often requesting extensions along the way).[103] That’s 110 days already (assuming no extensions have been requested and granted) — and we haven’t even agreed to grant the case yet, much less scheduled oral argument (of which parties are usually given a minimum of twenty-one days notice). Then, after oral argument, the Court engages in spirited analysis and discussion of the legal issues. Opinion drafts by the authoring justice, and then any concurring or dissenting opinions, are circulated and conferenced, often many times, before the Court is confident enough with its reasoning and judgment to issue an opinion. And frequently, the more the Court debates the issues, the majority view becomes the minority view, and vice versa, meaning the competing writings have to be converted.
In terms of its statewide budgetary impact (not to mention its jurisprudential impact), this case may be the most consequential of the Term. It thus demands, and deserves, our most meticulous study. Fast-forwarding and vacuum-packing a multi-billion dollar challenge to a major piece of the Texas tax system does a grave disservice not only to the parties involved, but also to the wider public that deserves methodically researched and reasoned Supreme Court rulings to guide their actions. This case may have been filed 120 days ago, but we heard the parties’ oral arguments only 35 days ago. Allcat might justifiably wonder whether today’s outcome might have been different had the Court taken more time to marinate in these high-stakes questions of law.
One of the ironies of section 24(b) is that such deadlines prejudice the State more than anyone else. Allcat and the other Relators had five years to gird for what *492 they knew would be a brief (but pitched) legal battle. The State — specifically, the Attorney General and the Comptroller— had to throw together its arguments under an expedited briefing schedule we were forced to impose.
A pro-State observer might conclude, “No harm, no foul” — after all, the State won. But the State might lose the next expedited case. And who’s to say that loss might not be attributable, at least in part, to the very fact that this Court felt obliged to rush to judgment, literally, in order to meet a no-exceptions deadline.
True, a rule mandating faster judicial decisions would ensure faster judicial decisions, but there’s often an inverse correlation between faster and better. When parties appear before a court, there is more at stake for them, and for our system of government, than getting a quick answer. Quick answers are, I concede, quick (if nothing else), but the judiciary’s legitimacy, and elegance, derive from the fact that judges are expected to explain how we reasoned our way to a legal conclusion. Reasoning takes time.[104] So does legislating, which may explain why important matters sometimes fall through the cracks as lawmakers sprint to beat their own 140-day clock.[105]
Every case in this Court deserves painstaking judicial review, whether it involves only a few dollars or, as here, untold billions. But considered review requires consideration. Obviously, urgent matters sometimes arise that require urgent answers — for example, parental-notification cases. Nobody disputes that. But allowing the Legislature free rein to fast-forward select judicial decisions threatens to subvert the quality of those decisions, dilute the judiciary’s independence and coequal status, undermine the vitality of judicial review, and concentrate too much power in the hands of a single branch— precisely what the separation of powers doctrine is designed to combat.[106]
*493 Caselaw from other jurisdictions — plus the Court of Criminal Appeals — suggests a host of “where do you draw the line” concerns with section 24(b). As our sister High Court noted in Armadillo Bail Bonds, if the law in that case were allowed to stand, then the Legislature had the power to forever block a court from entering judgments.[107] Applied to this case, if the Legislature can order the Supreme Court to decide a case within 120 days, why not thirty days, or seven days, or less? There is no principled way to draw such a line. Hence, if the Legislature can mandate this deadline, they can mandate any deadline, no matter how arbitrary.[108] While our Constitution may give ultimate authority to the Legislature to set the “rules of court,” it does not give the Legislature carte blanche to encroach upon the judiciary’s substantive rights.[109]
In sum, I have reservations over the constitutionality of section 24(b). The Court refrains from addressing the issue, as no party raised it. Perhaps a future case will squarely ask whether the Constitution permits one branch of government to instruct another on core matters in this way.
III. Conclusion
Spurred by a short fuse of dubious constitutionality, the Court has been harried and hurried into reinventing our mandamus jurisprudence beyond its constitutional and prudential limits. I concur with the Court that we lack jurisdiction over All-cat’s as-applied challenge and its request for attorney fees. From the remainder of the Court’s opinion, I respectfully dissent.

. The Federalist No. 78, at 427 (Alexander Hamilton) (E.H. Scott ed., 1898).

. See, e.g., Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992).

. See id.

. Tex. Const. art. V, § 3(a).

. Id.

. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 24(a), 2006 Tex. Gen. Laws 1, 40 [hereinafter "Act”].

. See generally the Act.

. Ante at 462 (citing Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515, 522 (1930)).

. Tex Const. art. V, § 3(a) (emphasis added); see also Love, 28 S.W.2d at 522 (''[T]he Constitution limits the original jurisdiction of the court to the issuance of writs of quo warranto and mandamus.”).

. See Act § 24(a).

. 28 S.W.2d at 521-22.

. Id.

. See id. at 522.

. Act § 24(a).

. See Love, 28 S.W.2d at 522.

. See Tex. Const. art. V, § 3(a); Love, 28 S.W.2d at 522. I do not disagree with the Court's point that, where our mandamus jurisdiction attaches, the Court has the correlative authority to grant injunctive or declaratory relief. See ante at 461 (citing Lane v. Ross, 151 Tex. 268, 249 S.W.2d 591, 593 (1952)). But the key point the Court skates over is that we have this correlative authority only in those cases where our mandamus jurisdiction has attached. See Lane, 249 S.W.2d at 593. Attachment occurs only where the Legislature expressly gives us the authority to issue writs of mandamus (or quo warranto). My analysis of this sub-issue might be different if section 24(a) said something like the following: “The supreme court has the power, or authority, or jurisdiction, to issue writs of mandamus in conjunction with challenges to the constitutionality of this Act.” But the Act says nothing of the sort. And section 24(a)'s express grant of authority to issue injunctions or declaratory judgments does not change this fundamental fact.

. Ante at 462.

. See Tex. Const. art V, § 3(a).

. I discuss this second factor further infra Section I.C.

. See generally Tex. Tax Code ch. 112.

. Importantly, no one disputes this is a Chapter 112 taxpayer suit and that Chapter 112's restrictions thus apply. The Court, in discussing jurisdiction over Allcat’s facial challenge, states explicitly and unequivocally that "Allcat's claim is subject to chapter 112 of the Tax Code.” Ante § III. The parties appear to agree. In its brief, Allcat cites to sections 112.051-.053 to show it complied with the Code’s pre-filing requirements.

. Tex. Tax Code § 112.108 (emphasis added).

. In addition to this restriction, Chapter 112 creates others, such as mandating that a taxpayer bring her taxpayer suit in the district court of Travis County. Tex Tax Code § 112.001. This is, in turn, a legislatively created exception to the default jurisdiction rule in our Constitution: Under Article V, Section 8, the district courts have exclusive original jurisdiction over all matters unless the Legislature specifies otherwise. See Tex. Const. art. V, § 8. Section 24(a) of the Act, in terms of its jurisdiction grant, purports to create an "exception to the exception” requiring taxpayers to bring their constitutional challenges to the Act in this Court.

. See Act § 24(a).

. Importantly, because the Act does not give us original mandamus jurisdiction in suits challenging the Act, it cannot give us authority to grant declaratory or injunctive relief in such suits either. As discussed supra Section I.A., we held in Love that the Legislature cannot give us jurisdiction to issue such relief in original proceedings, absent a contemporaneous issuance of a writ of mandamus. Love, 28 S.W.2d at 522. We refined this point in Lane, noting that we can issue injunctions or declaratory judgments, in original proceedings, to make our mandamus writs effective-but Lane did not change the fact that the Legislature cannot give us authority, in original proceedings, to issue stand-alone injunctions or declaratory judgments. Lane, 249 S.W.2d at 593. Because the Legislature lacks that power, its attempt to do so here is invalid.

. See Tex. Gov’t Code § 22.002(a).

. See supra § I.A.

. As the Court notes in concluding that we lack jurisdiction over Allcat’s as-applied challenge, the Government Code's conferral of mandamus jurisdiction does not override Chapter 112’s prohibition on mandamus, either. See ante § III. We have held that Government Code section 22.002(c) grants us original jurisdiction over mandamus proceedings against executive government officers, and gives us exclusive authority to issue the writ against them. See A & T Consultants, Inc. v. Sharp, 904 S.W.2d 668, 673-74 (Tex.1995). However, this conflicts with Chapter 112’s more specific, later-enacted prohibition on courts issuing mandamus relief in taxpayer suits.

. See ante § III.

. Walker, 827 S.W.2d at 839.

. Id. at 839-40.

. Id.

. Id. at 839. As the Walker Court noted, since the 1950's the Court has increasingly used the writ to correct “clear abusefs] of discretion” by trial courts. Id. (citing cases).

. See Turner v. Pruitt, 161 Tex. 532, 342 S.W.2d 422, 423 (1961).

. Id.

. State Bar of Tex. v. Heard, 603 S.W.2d 829, 832 (Tex.1980) (emphasis added) (quoting Comm'r of the Gen. Land Office v. Smith, 5 Tex. 471, 479 (1849)).

. See ante at 462 (asserting that "Allcat seeks an order directing the Comptroller to refund part of the taxes it paid” and therefore concluding that mandamus is “proper or necessary” here); id. at 462 (“In this matter, if Allcat is correct and the Act is unconstitutional, then the Act does not provide legal authority for the Comptroller to retain the taxes and Allcat will be entitled to mandamus directing a refund.”).

. Id. at 473.

. See, e.g., Walker v. Gutierrez, 111 S.W.3d 56, 66 (Tex.2003) (noting that when this Court reviews the constitutionality of a statute, we "presumfe] the statute is constitutional,” and "the party challenging the constitutionality of a statute bears the burden of demonstrating that the enactment fails to meet constitutional requirements”).

. 713 S.W.2d 335 (Tex.1986).

. Id. at 337.

. See id. at 336-37.

. 140 Tex. 271, 167 S.W.2d 147 (1942).

. See id. at 156.

. See generally id.

. Tex Const. art. XVI, § 1.

. Heard, 603 S.W.2d at 832.

. See Tex Const. art. II, § 1.

. See id. art. I, § 28 (“No power of suspending laws in this State shall be exercised except by the Legislature.”).

. See Corsicana Cotton Mills, Inc. v. Sheppard, 123 Tex. 352, 71 S.W.2d 247, 251 (1934).

. Id.

. Id. at 248.

. Id.

.Id.

. Id.

. Id. at 249.

. Id. at 251.

. Id. (emphasis added).

. See Walker, 827 S.W.2d at 839.

. See Corsicana Cotton Mills, 71 S.W.2d at 251.

. See Walker, 827 S.W.2d at 839.

. See In re McAllen Med. Ctr., Inc., 275 S.W.3d 458, 474-75 (Tex.2008) (Wainwright, J., dissenting).

. Id.

. See ante at 462 ("The Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions.”).

. Act § 24(b).

. Article II, Section 1 states:
The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.
Tex. Const. art. II, § 1.
This concept has a rich history in Texas, predating even the Republic itself. In fact, there has been a Separation of Powers provision in every one of Texas’s Constitutions. The wording in the current Constitution is identical to the wording used in our four previous state constitutions. Tex. Const. art. II, § 1, interp. commentary (Vernon 2007); see Harold H. Bruff, Separation of Powers Under the Texas Constitution, 68 Tex. L.Rev. 1337, 1340 (1990) [hereinafter "Bruff, Separation of Powers "]. The Republic of Texas had a shorter version in its Constitution, but the idea was exactly the same. See The Constitution of the State of Texas: An Annotated and Comparative Analysis 89 (George D. Braden ed., 1977) [hereinafter "Braden, Constitution of Texas”]. Texas even had a Separation of Powers provision before it was Texas: Such *486 provisions appeared in both the Mexican national constitution of 1824 and the Coahuila y Tejas state constitution of 1827. Id..; Bruff, Separation of Powers, at 1341 n. 24.

. The Texas Constitution differs — and has always differed — from its federal counterpart in that it explicitly separates the branches of government (whereas the federal Constitution includes no such provision). See Braden, Constitution of Texas, at 89; see generally U.S. Const The fact that Texas has an express separation of powers provision "reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government.” See Armadillo Bail Bonds v. State, 802 S.W.2d 237, 239 (Tex.Crim.App. 1990). So said our constitutional twin, the Texas Court of Criminal Appeals, in striking down an unconstitutional infringement by the Legislature of the judiciary's powers.
The Framers of the U.S. Constitution saw the separation of powers principle as fundamental to their new republic — even if they did not explicitly enshrine the concept in that document. See, e.g., The Federalist No. 47, at 266 (James Madison) (E.H. Scott ed., 1898) (arguing that "[n]o political truth is certainly of greater intrinsic value” than the separation of powers doctrine). Madison reasoned that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many ... may justly be pronounced the veiy definition of tyranny.” Id. Madison, in turn, thought Montesquieu had written one of the most compelling discussions of the doctrine, and quoted him extensively when urging ratification of the U.S. Constitution:
When the legislative and executive powers are united in the same person or body ... there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner ... Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor.
Id. at 268-69 (quoting Montesquieu, The Spirit of the Laws, Book XI, ch.6).
Madison, like Montesquieu, and like Blackstone as well, saw the separation of powers "to be one of the chief and most admirable characteristics of the English Constitution.” Langever v. Miller, 124 Tex. 80, 76 S.W.2d 1025, 1035 (1934). And John Adams reasoned that balancing one state power against the other two was the way to keep human nature in check and preserve any degree of freedom. Tex. Const. art. II, § 1, inter, commentary (Vernon 2007).

. State Bd. of Ins. v. Betts, 158 Tex. 83, 308 S.W.2d 846, 851-52 (1958); see Gen. Servs. Comm'n v. Little-Tex Insulation Co., 39 S.W.3d 591, 600 (Tex.2001).

. See Tex. Const. art. V, § 1 (vesting the “judicial power" of Texas in this Court and other courts); id. § 3(a) (delineating the powers of this Court).

. Robinson v. Crown Cork & Seal Co., 335 S.W.3d 126, 165 (Tex.2010) (Willett, J., concurring) (citations omitted).

. See Betts, 308 S.W.2d at 851-52; Little-Tex Insulation Co., 39 S.W.3d at 599.

. It appears that we first announced this rule in State Board of Insurance v. Betts. At issue there was a statute that gave the executive a role in the liquidation of insurance companies. 308 S.W.2d at 849. Specifically, the statute allowed the State Board of Insurance to appoint a receiver for bankrupt insurance companies and to administer their liquidation — with judicial supervision. Id. The Court noted that the process of liquidation is not an inherently judicial function; at the same time, it noted that the courts have an important role to play in such proceedings. Because the law refrained from interfering with the court’s exercise of a judicial function — but still gave them a role to play in something of judicial importance — this Court upheld the law. See id. at 851-52. The Court reached a similar conclusion in General Services Commission v. Little-Tex Insulation Co. See 39 S.W.3d at 594-98, 600.

. Betts, 308 S.W.2d at 851.

. Tex. Const. art. II, § 1, interp. commentary (Vernon 2007). In fact, the Framers of our Constitution built an explicit “escape clause” into the Separation of Powers provision. Tex. Const, art. II, § 1 (stating that no branch may exercise any power of the other branches “ex *488 cept in the instances [fiherein expressly permitted”).

. See Tex. Const. art. V, § 31(a), (b).

. Id. §§ 31(a)-(c).

. Id.

. See Armadillo Bail Bonds, 802 S.W.2d at 241; see also Meshell v. State, 739 S.W.2d 246, 252-57 (Tex.Crim.App.1987) (holding that the “Speedy Trial Act" violated the Separation of Powers provision by infringing on judicial powers established by Tex. Const. art. V,§ 21).

. Betts, 308 S.W.2d at 851.

. Armadillo Bail Bonds, 802 S.W.2d at 239 (emphasis in original).

. See id. at 238-39.

. Id.

. Id. at 241.

. Id.

. Id.

. Id.

. See id. at 240.

. Id.

.The Court of Criminal Appeals has since upheld legislatively enacted rules that affect the schedules of the district courts. See State v. Williams, 938 S.W.2d 456 (Tex.Crim.App.1997). Williams does not invalidate or even restrict the reasoning from Armadillo Bail Bonds, however. In Williams, the law at issue required district courts to dismiss with prejudice charges against an extradited defendant if the state did not commence trial within 120 days of the defendant's arrival in Texas. 938 S.W.2d at 457-58. Notably, the law included an out: The court could grant "any reasonable or necessary continuance” if it wanted. Id. at 458 n. 3. The Court of Criminal Appeals concluded that the law did not unconstitutionally infringe on the judiciary’s freedom to exercise core judicial powers. Id. at 459. In doing so, the Court reasoned that district courts do not have constitutionally protected authority over whether a case is dismissed. Id. Even if correct, this does not affect the holding or reasoning from Armadillo Bail Bonds — rendering judgment and deciding questions of law are core judicial functions, and the Legislature cannot interfere with the judiciary's exercise of these. See 938 S.W.2d at 458-59.

. See State ex rel. Emerald People’s Util. Dist. v. Joseph, 292 Or. 357, 640 P.2d 1011 (1982).

. See, e.g., In re Grady, 118 Wis.2d 762, 348 N.W.2d 559 (1984); Coate v. Omholt, 203 Mont. 488, 662 P.2d 591 (1983); Sands v. Albert Pike Motor Hotel, 245 Ark. 755, 434 S.W.2d 288 (1968); Waite v. Burgess, 69 Nev. 230, 245 P.2d 994 (1952); State ex rel. Kostas v. Johnson, 224 Ind. 540, 69 N.E.2d 592 (1946); Holliman v. State, 175 Ga. 232, 165 S.E. 11 (1932); Atchison, T. & S.F. Ry. Co. v. Long, 122 Okla. 86, 251 P. 486 (1926); Schario v. State, 105 Ohio St. 535, 138 N.E. 63 (1922).

. Coate, 662 P.2d at 593. A judge who failed to issue his opinion before the 120-day deadline was in automatic violation of the law and could face sanctions (including a pay dock). Id.

. Id. at 596-97.

. See Mont. Const. art. Ill, § 1; Coate, 662 P.2d at 594.

. Coate, 662 P.2d at 596.

. Id. at 597.

. A. Leo Levin and Anthony G. Amsterdam, Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision, 107 U. Penn. L.Rev. 1, 30 (1958).

. Id. at 31-32.

. Id. at 32.

. Id.

. See Betts, 308 S.W.2d at 851-52.

. See Tex.R.App. P. 53.7, 56.1.

. Tex.R.App. P. 55.7.

. This dissent would doubtless be at least two-thirds shorter were the Court not sprinting to abide the November 28 deadline.

. See Chuck Lindell, Legislature's Mistake Jeopardizes License Plate Law, Austin American-Statesman, Nov. 15, 2011, available at http://www.statesman.com/news/texas-politics/legislatures-mistake-jeopardizes-license-plate-law-1971446.html (noting that in "the frantic final day of the legislative session,” the Legislature "mistakenly omitted the $200 fine for driving a vehicle without license plates, possibly jeopardizing the enforcement of related laws”).

. Not too long ago, the Legislature was more attentive to separation of powers concerns, and more inhibited about encroaching on judicial power via mere statute. In 1997, Article V of the Constitution was amended by adding Section 31(d). See Tex Const. art. V, § 31(d) (adopted at Nov. 4, 1997 election). That provision states as follows: "Notwithstanding Section 1, Article II, of this constitution and any other provision of this constitution, if the supreme court does not act on a motion for rehearing before the 180th day after the date on which the motion is filed, the motion is denied.” Id. (emphasis added). With this amendment, the Legislature and the voters filled a gap in the Texas Rules of Appellate Procedure — if this Court did not act on a motion for rehearing after denying a petition or after rendering final judgment, that motion was automatically denied. See id.
The text alone of this amendment illustrates an important point. Specifically, it indicates that the Legislature thought that enacting such a rule via statute at least implicated the Separation of Powers provision. This may very well explain why the Legislature worded the amendment such that the 180-day rule would apply "[njotwithstanding Section 1, Article II” of the Constitution — that is, notwithstanding the Separation of Powers provision.
And it’s important to note that, when this amendment passed, the Legislature already had the power to amend this Court’s rules or adopt rules of its own. See Tex Const. art. V, §§ 31(a)-(c) (giving the Legislature final authority over the rules governing the judiciary). In fact, it had possessed that power for twelve *493 years. See id. So when the Legislature chose to act, it clearly knew it had the authority to create this rule. But it apparently thought the Constitution, specifically the Separation of Powers provision, barred it from doing so absent a constitutional amendment to the contrary. See id. art. II, § 1.

. 802 S.W.2d at 241.

. See Coate, 662 P.2d at 597.

. Armadillo Bail Bonds, 802 S.W.2d at 241.